MARC E. HANKIN (SBN: 170505)
E-Mail: Marc@hpl.law
**HANKIN PATENT LAW, APC**
11414 Thurston Cir.
Los Angeles, CA 90049
Telephone: (310) 979-3600

Attorneys for PLAINTIFF,
**MMAS RESEARCH LLC**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

MMAS RESEARCH LLC, a Washington limited liability company,

Plaintiff,

v.

GENENTECH, INC., a Delaware corporation; GE HEALTHCARE TECHNOLOGIES INC., a Delaware corporation; BRISTOL-MYERS SQUIBB COMPANY, a Delaware corporation; THE UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT HOUSTON; RESMED INC., a Delaware corporation; EILEEN SHINN, an individual; THE UNIVERSITY OF TEXAS MD ANDERSON CANCER CENTER; ANTONIO WOLFF, an individual; THE JOHNS HOPKINS UNIVERSITY; and DOES 1 through 10, inclusive,

Defendants.

Case No. 2:26-cv-12403-FLA-SKx

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

1. Breach of Contract (BMS);
2. Copyright Infringement, 17 U.S.C. §§ 106, 501;
3. Copyright Management Information, 17 U.S.C. § 1202;
4. Misappropriation of Trade Secrets, 18 U.S.C. § 1836;
5. Declaratory Relief, 28 U.S.C. §§ 2201–2202;
6. Breach of Contract (UTHealth);
7. Misappropriation of Trade Secrets, 18 U.S.C. § 1836 (UTHealth);
8. Misappropriation of Trade Secrets, 18 U.S.C. § 1836 (Shinn);
9. Misappropriation of Trade Secrets by Misuse, 18 U.S.C. § 1836 (Genentech, GE HealthCare);
10. Misappropriation of Trade Secrets, 18 U.S.C. § 1836 (ResMed);
11. Willful Copyright Infringement, Derivative German MMAS-8, 17 U.S.C. §§ 106, 501 (ResMed);
12. Copyright Infringement, 17 U.S.C. §§ 106, 501 (Johns Hopkins);
13. Contributory and Vicarious Copyright Infringement (Johns Hopkins);
14. Copyright Management Information, 17 U.S.C. § 1202(b) (Johns Hopkins);
15. Misappropriation of Trade Secrets, 18 U.S.C. § 1836 (Johns Hopkins);
16. Misappropriation of Trade Secrets, 18 U.S.C. § 1836 (Wolff, Johns Hopkins);
17. Misappropriation of Trade Secrets, 18 U.S.C. § 1836 (MD Anderson).

**DEMAND FOR JURY TRIAL**

Plaintiff MMAS RESEARCH LLC ("MMAS Research" or "Plaintiff"), for its causes of action against Defendants GENENTECH, INC. ("Genentech"), GE HEALTHCARE TECHNOLOGIES INC. ("GE HealthCare"), BRISTOL-MYERS SQUIBB COMPANY ("BMS"), THE UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT HOUSTON ("UTHealth"), RESMED INC. ("ResMed"), EILEEN SHINN ("Shinn"), THE UNIVERSITY OF TEXAS MD ANDERSON CANCER CENTER ("MD Anderson"), ANTONIO WOLFF ("Wolff"), THE JOHNS HOPKINS UNIVERSITY ("Johns Hopkins"), and DOES 1 through 10, inclusive (collectively, "Defendants"), alleges as follows:

**JURISDICTION AND VENUE**

1. This action arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, including 17 U.S.C. §§ 501 and 1202; the Defend Trade Secrets Act, 18 U.S.C. § 1836. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and (b), and 18 U.S.C. § 1836(c); supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a); and jurisdiction over the declaratory claim under 28 U.S.C. §§ 2201 and 2202.

2. This Court has personal jurisdiction over BMS by consent. Section 2(h) of the BMS License provides that "all disputes and litigation regarding this Agreement, its construction and matters connected with its performance shall be subject to the exclusive jurisdiction of the state and federal courts in the Central District of California," and that "[t]he Parties hereby waive any challenge to the jurisdiction or venue of the Court over these matters."

3. This Court has personal jurisdiction over Genentech, whose principal place of business is at 1 DNA Way, South San Francisco, California, and which conducts continuous and systematic business in this District. Genentech, with Roche and icometrix, conducted ILLUMINATE at United States sites under a registration stating that the study involves a U.S. FDA-regulated device product manufactured in and exported from the United States, and distributed icompanion ms to United

States participants and clinicians. It has personal jurisdiction over GE HealthCare, which conducts continuous and systematic business in California, including through employees based in this State; which is the designated United States Agent for the FDA establishment registration under which icometrix lists icompanion for distribution in the United States; and which, on information and belief, owns and controls icometrix and directs the conduct alleged. It has personal jurisdiction over ResMed, whose principal place of business is at 9001 Spectrum Center Boulevard, San Diego, California 92123, which, on information and belief, conducts continuous and systematic business throughout California, including in this District, and which directed from California the conduct alleged in Section K (¶¶ 24, 116–125).

4. This Court has personal jurisdiction over UTHealth by consent. The McGovern License provides: “Licensee agrees to the authority in and venue for any breach of the license contract take place in the authority of the Los Angeles County, California State, and United States Federal Courts.” (Exhibit 22.)

5. This Court has personal jurisdiction over Shinn. PALLAS (NCT02513394), the trial whose adherence results Shinn analyzed and published as lead and corresponding author (¶ 99), lists 437 registered sites, 33 of them in California, including Cedars-Sinai Medical Center in Los Angeles and Kaiser Permanente medical centers in this District. On information and belief, the modified Morisky composite was administered to PALLAS participants at those California sites, and their results are among those Shinn published (Exhibit 40).

6. This Court has personal jurisdiction over Johns Hopkins. Since 2017 Johns Hopkins has corresponded with Plaintiff in California over the unlicensed use of the MMAS-8, and since August 11, 2021 through its Office of the Vice President and General Counsel, which conferred with Plaintiff’s managing member and received Plaintiff’s written settlement offer (¶¶ 126–134). It received Plaintiff’s written complaints about POvIV2, sent from California, on June 7 and July 9, 2026, acknowledged the second in writing on July 20, 2026, and continued (¶ 152). Johns

Hopkins thereby expressly aimed the conduct alleged at Plaintiff in California, where Plaintiff suffers the harm, and Plaintiff's claims against it arise out of that conduct. On information and belief, Johns Hopkins also transacts business in California, including through the multicenter research networks in which it participates.

7. This Court has personal jurisdiction over Wolff. Wolff co-authored and published the PALLAS adherence results (¶ 112), which, on information and belief, include those of participants at the 33 California PALLAS sites (¶ 5; Exhibit 40). On June 15, 2025, Plaintiff sent Wolff written notice, from California, of the conduct alleged (¶ 113).

8. This Court has personal jurisdiction over MD Anderson. MD Anderson's faculty analyzed and published the PALLAS adherence results under its name (¶ 110), which, on information and belief, include those of participants at the 33 California PALLAS sites (¶ 5; Exhibit 40). MD Anderson received Plaintiff's written complaint, sent from California, on May 31, 2026, and acknowledged it in writing (¶ 111).

9. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), a substantial part of the events giving rise to the claims having occurred here; under 28 U.S.C. § 1400(a); and, as to BMS, by the exclusive selection of the Central District of California in Section 2(h) of the BMS License; and, as to UTHealth, by the McGovern License's selection of the authority of Los Angeles County, California State, and United States Federal Courts.

## NATURE OF THE ACTION

10. Plaintiff owns the Morisky Widget and the scoring and coding criteria of the Morisky Widget MMAS-8/MMAS-4 (Section B). Since January 1, 2017, the Morisky Mandate has required that every MMAS-8 and MMAS-4 test be administered, scored and coded in the Morisky Widget (Section C). Each Defendant altered that scoring and coding and ran seriously ill patients through the result:

Genentech and GE HealthCare in ILLUMINATE, in multiple sclerosis (Section G); BMS in SIMPLICITY, in chronic myeloid leukemia (Section H); UTHealth in adults with diabetes and hypertension and in pregnant women (Section I); Shinn, MD Anderson, Wolff and Johns Hopkins in PALLAS, in early breast cancer (Section J); ResMed in actensio, in hypertension (Section K); and Johns Hopkins in its own studies (Section L).

11. On August 18, 2023, the only published validation of the MMAS-8 was retracted. Recalculated from the article's own data, the MMAS-8 identifies about 38% of patients who are not taking their medicine, not the 93% the article claimed; about 62 of every 100 such patients are recorded as taking it (Section E). Their clinicians, told the medicine is being taken, read worsening disease as a failing drug and escalate, while the missed doses go untreated; where one number stands for several medicines, no clinician can tell which medicine was missed. Each Defendant owed each patient it measured the duty to act for the patient's benefit and to protect the patient from harm, and each breached it.

12. Before filing, Plaintiff told each Defendant in writing that its altered scoring and coding were putting patients at risk, asked it to correct the scoring and coding and to tell the patients' clinicians, and took the same facts to the Food and Drug Administration, which docketed the complaint as CPT2601952 (Exhibit 6), and to offices of research integrity and the journals (Sections G–L). Genentech gave no answer on the merits; GE HealthCare answered that it relies on a license from MMAR; on information and belief, BMS has not answered; and Johns Hopkins has sent nothing but a receipt. None has corrected the record or told the clinicians.

13. Joinder is proper under Federal Rule of Civil Procedure 20(a)(2). Each Defendant's liability arises out of the same series of occurrences — the administration, scoring and coding of the MMAS-8 or MMAS-4 outside the Morisky Widget after the Morisky Mandate — and turns on the same questions: whether Plaintiff owns the Morisky Widget, Registration No. TX 8-816-517, as the Ninth

Circuit has held (Sections B, F); what MMAR could and could not license after the District of Nevada held its forms not copyrightable (Section F); what the Morisky Widget MMAS-8/MMAS-4 scoring and coding criteria are, and whether they are trade secrets (Section C); and whether an altered construction of them is misappropriation by use under Compulife Software Inc. v. Newman, 959 F.3d 1288 (11th Cir. 2020). Those questions can be decided once, binding every party; each Defendant's own conduct is set out in its own Section. Plaintiff brings these claims in one action so as not to multiply proceedings contrary to this Court's Local Rules. Under L.R. 83-1.3.1, cases are related when they "arise from the same or a closely related transaction, happening, or event," "call for determination of the same or substantially related or similar questions of law and fact," or "for other reasons would entail substantial duplication of labor if heard by different judges." L.R. 83-1.3.1 adds: "That cases may involve the same patent, trademark, or copyright does not, by itself, constitute a circumstance contemplated by (a), (b), or (c)." This action does not rest on the copyright alone. It meets (a) and (b) for the reasons just stated, which go beyond the copyright, and (c), because each of those questions would be litigated nine times before different judges. Plaintiff will not divide this action, or dismiss and refile any part of it, to obtain a different judge; under L.R. 83-1.2.1, "[i]t is not permissible to dismiss and thereafter refile an action for the purpose of obtaining a different judge." Plaintiff will comply with its continuing duty under L.R. 83-1.3.4 to file a Notice of Related Cases.

## THE PARTIES

14. Plaintiff MMAS Research LLC is a Washington limited liability company with its principal place of business at 101 2nd St., Petaluma, California 94952. Plaintiff owns the "MMAS RESEARCH WIDGET CODE" (the "Morisky Widget"), U.S. Copyright Registration No. TX 8-816-517, registered December 3, 2019 (Exhibit 1), the Morisky Widget MMAS-8 and the Morisky Widget MMAS-4.

15. Defendant Genentech, Inc. is a Delaware corporation with its principal place of business at 1 DNA Way, South San Francisco, California 94080, and a member of the Roche Group.

16. Defendant GE HealthCare Technologies Inc. is a Delaware corporation with its principal place of business at 500 W. Monroe Street, Chicago, Illinois 60661, and, on information and belief, the owner of icometrix NV ("icometrix"), a Belgian company in Leuven, the developer of icompanion ms and the named collaborator on NCT05949580.

17. F. Hoffmann-La Roche Ltd ("Roche"), Basel, Switzerland, a member of the Roche Group with Genentech, is the sponsor and responsible party of record for ILLUMINATE, ClinicalTrials.gov No. NCT05949580.

18. Defendant Bristol-Myers Squibb Company is, on information and belief, a Delaware corporation with its principal place of business at Route 206 & Province Line Road, Princeton, New Jersey 08543, the sponsor of SIMPLICITY, ClinicalTrials.gov No. NCT01244750, and the licensee under the BMS License.

19. Defendant The University of Texas Health Science Center at Houston ("UTHealth") is an institution of The University of Texas at 7000 Fannin Street, Houston, Texas 77030. Its components include McGovern Medical School, the School of Public Health and its Brownsville Regional Campus, and the Center for Health Promotion and Prevention Research. UTHealth is the licensee under the McGovern License (¶ 77).

20. *McGovern Medical School, the licensee.* UTHealth is sued as the licensee. It obtained both the McGovern License and the Obstetrics License through McGovern Medical School (¶¶ 77–80; Exhibits 22, 30, 31).

21. Defendant Eileen Shinn is, on information and belief, a faculty member of The University of Texas MD Anderson Cancer Center, Houston, Texas, and is the lead and corresponding author of the PALLAS adherence article (¶ 99). She is sued in her individual capacity.

22. Defendant The University of Texas MD Anderson Cancer Center ("MD Anderson") is, on information and belief, an institution of The University of Texas System with its principal place of business in Houston, Texas. It is Shinn's employer, and the PALLAS adherence article gives it as the affiliation of Shinn, its lead and corresponding author, and of its co-author William Fraser Symmans (¶ 110; Exhibit 40).

23. Defendant Antonio Wolff is, on information and belief, a faculty member of The Johns Hopkins University, Baltimore, Maryland, and a co-author of the PALLAS adherence article, which gives his affiliation as "Johns Hopkins University/ECOG, Baltimore, MD, USA" (¶ 112; Exhibit 40). He is sued in his individual capacity.

24. Defendant ResMed Inc. is, on information and belief, a Delaware corporation with its principal place of business at 9001 Spectrum Center Boulevard, San Diego, California 92123. On information and belief, since August 2022 ResMed has owned, through a wholly owned subsidiary (the "ResMed subsidiary"), actensio, a prescription digital application for controlling high blood pressure, and ResMed is the designated United States Agent for the ResMed subsidiary's FDA establishment registration.

25. Defendant The Johns Hopkins University ("Johns Hopkins") is, on information and belief, a Maryland nonprofit corporation with its principal place of business in Baltimore, Maryland. The Johns Hopkins Bloomberg School of Public Health houses the Coordinating Center of the Major Extremity Trauma Research Consortium ("METRC"), the lead sponsor and responsible party for POvIV2 (¶ 136), and is the home of its co-principal investigator, Renan Castillo, PhD.

26. Morisky Medication Adherence Research, LLC ("MMAR") is a Nevada limited liability company whose Managing Member is Philip Morisky, located at 130 Granada Ave, Long Beach, California 90803-3251, doing business as

"Adherence" at www.adherence.cc and maintaining www.moriskyscale.com. MMAR is not named as a defendant; Plaintiff will seek leave to add it if necessary.

27. The true names and capacities of DOES 1 through 10 are unknown to Plaintiff, which sues them by fictitious names and will seek leave to amend when their identities are determined. They include the incoming sponsor of NCT05949580.

## FACTS COMMON TO ALL CLAIMS

### A. BENEFICENCE — The Patients

28. *The patients here.* The patients in this action include an estimated 500 people with relapsing-remitting multiple sclerosis in ILLUMINATE, whose MMAS-8 results are sent to their neurologists (¶¶ 52, 63); 1,494 patients with chronic myeloid leukemia in SIMPLICITY (¶ 73); 3,806 Hispanic adults with poorly controlled type 2 diabetes and hypertension on the Texas–Mexico border in Salud y Vida (¶ 91); 227 pregnant women with gestational or pregestational diabetes in UTHealth's prenatal clinics (¶ 85); 4,688 women with early breast cancer in the PALLAS adherence analysis (¶ 105); 250 patients with infected fractures to be enrolled in POvIV2 (¶ 137); and 102 adults with hypertension randomized in ResMed's actensio trial, ninety of them, on up to three antihypertensive medicines, assessed with the MMAS-8 (¶ 118). Uncontrolled hypertension leads to stroke, heart attack and kidney failure. In a pregnant patient the duty runs to two patients: BOTH MOTHER AND BABY are at great risk. A multiple sclerosis relapse, and the disability it leaves, cannot be reversed. A patient recorded as adherent while missing doses receives no intervention, and the clinician who could have intervened is told that the medicine is being taken.

### B. Plaintiff Owns the Morisky Widget

29. On November 2, 2022, Donald E. Morisky swore, in a declaration filed as Docket Entry 48 in *MMAS Research, LLC v. The Charité*, No. 2:21-cv-01406-MWF-JPR (C.D. Cal.), that he owned the copyrights "includ[ing] the Morisky

Widget" and that "MMAS has no rights to or license in … the Morisky Widget copyrights," each assertion resting on a December 4, 2020 agreement.

30. On March 13, 2024, the Ninth Circuit, construing that agreement, held: "that agreement … was never finalized. MMAS thus never transferred its copyright and remains the registered owner of the Morisky Widget." *MMAS Research, LLC v. The Charité*, No. 23-55202 (9th Cir. Mar. 13, 2024) (unpublished) (Exhibit 2). The Court rejected abandonment. Plaintiff is and remains the sole owner of the Morisky Widget and of Registration No. TX 8-816-517.

**C. The Morisky Widget and the Morisky Mandate**

31. The 2006 printed MMAS-8 is a paper form for a single condition or a single medication, in English only, scored by hand, producing one score. The 2017 Morisky Widget MMAS-8 is made specific to each patient's conditions and medications, in more than eighty languages, is always scored and coded in the Morisky Widget, and produces three scores: raw medication adherence, intentional non-adherence and unintentional non-adherence.

32. From January 1, 2017, every MMAS-8 and MMAS-4 test was required to be administered, scored and coded in the Morisky Widget, as the Morisky Widget MMAS-8 or the Morisky Widget MMAS-4 (the "Morisky Mandate"): "Beginning January 2017, all data collection of the MMAS adherence scales must use the Morisky Widget"; "Dr. Morisky licenses all uses of the MMAS through the Morisky Widget. (NO EXCEPTIONS)." (Exhibit 17-4; Exhibit 17-39.)

33. *The Mandate, in Dr. Morisky's own words.* Exhibit 17 collects seventy-eight emails that Dr. Morisky sent from his UCLA account, dmorisky@ucla.edu, between February 17, 2017 and March 20, 2018, each addressed or copied to Plaintiff's managing member, in each of which Dr. Morisky states in his own text that the MMAS-8 and MMAS-4 may be used only through the Morisky Widget (Exhibit 17-1 to 17-78). The first, of February 17, 2017, records that he had told a prospective licensee of "the need for all administrations to be done by the Morisky

widget" (Exhibit 17-1). Fifty-six state, in the same words, "Beginning January 2017, all data collection of the MMAS adherence scales must use the Morisky Widget" (Exhibit 17-4 to 17-30, 17-32 to 17-40, 17-45 to 17-49, 17-52 to 17-54, 17-57 to 17-60, 17-62, 17-64, 17-67, 17-73, 17-75 to 17-78). Six state that "Dr. Morisky licenses all uses of the MMAS through the Morisky Widget" with "(NO EXCEPTIONS)" (Exhibit 17-39 to 17-40, 17-43 to 17-44, 17-46, 17-55). Fifteen state that use of the MMAS-8 outside a Morisky Widget license is "forbidden" (Exhibit 17-39, 17-43 to 17-44, 17-46 to 17-49, 17-52 to 17-53, 17-56, 17-58, 17-61, 17-63, 17-70, 17-72). Two state that the MMAS would no longer be administered by paper and pencil (Exhibit 17-30, 17-42). Two describe Plaintiff's managing member as the person "responsible for putting together the Morisky Widget" (Exhibit 17-50 to 17-51). They went to researchers, hospitals, universities and companies in the United States and elsewhere, including Yale University (Exhibit 17-45), the University of California, San Francisco (Exhibit 17-34), Texas Tech University Health Sciences Center (Exhibit 17-5), Temple University (Exhibit 17-57 to 17-58), the University of Georgia (Exhibit 17-62), San Diego State University (Exhibit 17-23), the New Jersey Institute of Technology (Exhibit 17-12), Belmont University (Exhibit 17-21), Molloy College (Exhibit 17-32), VCU Health (Exhibit 17-9), Henry Ford Health System (Exhibit 17-17), MedStar Health (Exhibit 17-33), Dignity Health (Exhibit 17-37), Advocate Health Care (Exhibit 17-38), Carolinas HealthCare System (Exhibit 17-60), Church Health (Exhibit 17-78), Mercy (Exhibit 17-56) and HealthCore (Exhibit 17-64). The Morisky Mandate was the author's own written rule, in force when every Defendant administered, scored or published the MMAS-8 outside the Morisky Widget.

34. The scoring and coding criteria of the Morisky Widget MMAS-8 and MMAS-4 — the conversion of the eighth item into weighted increments, the three-band classification, the derivation of the intentional and unintentional non-adherence scores, and the condition-, medication- and language-specific rendering architecture

— are Plaintiff's trade secrets, disclosed only to licensees, only after training and certification, and only under written covenants that they can never be divulged in any publication, presentation or website without Plaintiff's written permission.

35. The three Morisky Widget MMAS-8 bands are high adherence, a total of 8; medium adherence, greater than 6 and less than 8; and low adherence, 6 or below. Because the eighth item contributes in quarter-point increments, a band written as two integers can only be produced by collapsing the eighth item before classification.




## D. Roche Was Told in 2017, and Roche Took the License in 2018

36. Roche asked, and was told the Mandate. On September 8, 2017, Jerome Basson, PhD, Business Manager, Contracts & Outsourcing, Global Pharma Procurement, F. Hoffmann-La Roche Ltd, Basel, wrote to Dr. Morisky: "In the context of a Roche Medical Affairs project we would need the licence to use the MMAS-4 questionnaire. This is the continuation of an existing project corresponding to the invoice attached." The same day Plaintiff answered, for Dr. Morisky and Plaintiff's managing member, that the license referenced "was terminated in September 2016," that "[y]ou can't administer any MMAS-4 tests beyond that date," and that "[s]ince January 2017, all users of the MMAS-4 must obtain a Morisky Widget license and be trained and certified" (Exhibit 13).

37. No single-study license. On October 6, 2017, Dr. Basson wrote that "Roche Medical Affairs is intending to set a new study and may need to administrate the MMAS-4 questionnaire," and asked for "a licence for this new trial only." Plaintiff answered: "Unfortunately we only License the MMAS scales through the perpetual indefinite term Morisky Widget. There are no single study MMAS licenses[.] No EXCEPTIONS." Dr. Basson asked "what to do to get a perpetual

licence and how much it costs," and on October 8, 2017 Plaintiff sent him a draft Morisky Widget License for "a Roche global Morisky Widget license" (Exhibit 13).

38. Roche's Legal department rewrote the license. On November 8, 2017, Dr. Basson returned "the draft licence agreement reviewed by the team and our Legal department," under the file name "MA29287 Morisky Widget MMAS License Word version_ review jb2 - revised Roche Legal - 01 11 2017," and wrote: "When agreed, I will clean up the document and we will start signatures (Roche signs first)" (Exhibits 13, 14). In Roche's revised text: (a) the license is "a perpetual (indefinite term) global license to use the MORISKY Widget from 01 January 2018" to F. Hoffmann-La Roche Ltd; (b) "Roche can use MMAS paper or electronic questionnaires but all scoring and coding must be done (automatically) in the Morisky Widget"; (c) "Coding and scoring criteria of the MMAS are trade secrets of MMAS and as such can never be divulged in any publication, presentation, or website without written permission from MMAS"; and (d) Roche may create "an unlimited number of free Morisky Widget sub licenses for Roche's Affiliates … worldwide if the Roche sub-licensee is trained and certified by MMAS" (Exhibit 14).

39. Genentech was inside the license. Roche's revised text defines "Affiliate" to include any organization "directly or indirectly controlled by a party to this Agreement" or "controlled, directly or indirectly, by the ultimate parent company of a party," and excludes only two: "Chugai Pharmaceutical Co. Ltd." and "Foundation Medicine, Inc." (Exhibit 14). Genentech, a member of the Roche Group (¶ 15) and, on information and belief, controlled by the ultimate parent company of F. Hoffmann-La Roche Ltd, was not excluded. Roche's Legal department wrote Genentech into the Morisky Widget license and its scoring and coding obligation.

40. Accepted, signed by Plaintiff, and not countersigned. On November 14, 2017, Plaintiff wrote: "The revised contract is acceptable." On November 15, 2017, Dr. Basson wrote that "[t]he team is ok for the training" but that "the Licence should

be signed before that," and Helene Sahri of Roche confirmed training and certification in Basel on November 30, 2017; on November 16, 2017, Plaintiff sent her the training materials for attendees (Exhibit 13). Plaintiff signed the license on November 18, 2017. On November 21, 2017, Dr. Basson acknowledged "the signed licence agreement" and amended its dates in writing "to have an effective date on 29th November 2017 and a training date on 30th November 2017" (Exhibit 20). On December 11, 2017, Plaintiff wrote that it had "not heard back from you since our meeting" and asked whether Roche was "not interested in finalizing a license to use the Morisky Widget." On December 12, 2017, Dr. Basson answered, copying Ms. Sahri and J. Michael Nebesky of Roche: "We are still interested but our project has a new significant delay and we will come back to you when we know more information" (Exhibit 13). Roche did not countersign in Basel. Seven months later, under the same protocol number, a Roche Group company in the United States did (¶¶ 41–44).

41. Roche Diabetes Care applies. On March 7, 2018, Ann Buskirk, Program Manager, Diabetes Care, Global Medical & Scientific Affairs, Roche Diabetes Care, Inc., 9115 Hague Road, Indianapolis, Indiana, sent Plaintiff a completed "Morisky Widget MMAS Application 2018" for use of the MMAS-8 in Roche Diabetes Care's Diabetes Health Partnership coaching program. Asked when it wanted to begin "using the perpetual Morisky Widget MMAS license," it answered: "We have new Customers entering into our Diabetes Health Partnership Coaching Program in April/ May." It projected 700 to 1,000 members on quarterly surveys, electronic administration in English and Spanish, and assessment of adherence to diabetes medications against HbA1c (Exhibit 19).

42. Roche's law department approves, and Roche Diabetes Care signs. On June 22, 2018, Eric Carlsgaard of Roche Diabetes Care wrote that the final edits were "done and stamped by legal" and awaited the "RDC head signature" (Exhibit 19). On June 27, 2018, Bradley T. Moore, President, signed the Morisky Widget

MMAS License Agreement for Roche Diabetes Care, Inc., under a stamp reading "Roche Law Dept. Approved As To Form," and Plaintiff signed on June 28, 2018 (Exhibit 18). It is "a perpetual (indefinite term) global license to use the MORISKY Widget from 30 June 2018," for a one-time license fee of 25,000 dollars that includes training and certification in the United States and 5,000 MMAS tests, and it carries Roche protocol number MA29287 and contract reference CW209203, the numbers of Roche's 2017 Basel license (¶ 38) (Exhibit 18). On July 3, 2018, Mr. Carlsgaard wrote: "Thank you and looking forward to working together" (Exhibit 19).

43. The same terms. The executed license carries Roche's 2017 trade-secret, scoring-and-coding and sub-license terms word for word (¶ 38(b)–(d)), and the same definition of "Affiliate," excluding only Chugai Pharmaceutical Co. Ltd. and Foundation Medicine, Inc. (Exhibit 18; ¶ 39).

44. Performance. On or about June 8, 2018, Plaintiff trained and certified Roche Diabetes Care's program personnel on the correct use of the Morisky Widget MMAS-8 and the Morisky Widget MMAS-4. Roche Diabetes Care then administered more than 500 Morisky Widget MMAS-8 tests to people with diabetes in the United States, each administered, scored and coded in the Morisky Widget. The Morisky Widget's own records show the Roche Diabetes Care organization, organization ID 8024fa31-310e-4671-b2b1-623fa934dd6e, with its users registered from April 9, 2018, provisioned with 5,300 tests, and 513 completed assessments (Exhibit 21). On June 19, 2020, Ms. Buskirk, then Medical Value Lead, wrote to Plaintiff that Roche Diabetes Care's study using the MMAS-8 was "complete with Manuscript ready for submission," and: "Per the agreement between MMAS Research LLC and Roche Diabetes Care,Inc, I am submitted for your review copyright and trademark requirements for MMAS." Plaintiff confirmed the manuscript's compliance the next day (Exhibit 19).

45. Genentech's free path, not taken. Genentech, controlled by the ultimate parent company of Roche Diabetes Care, Inc. (¶ 39), was a Roche Affiliate for which

Roche Diabetes Care could create a free Morisky Widget sub-license on training and certification by Plaintiff. On information and belief, no sub-license was created for Genentech or for ILLUMINATE, and no person who administered or scored the MMAS-8 in ILLUMINATE was trained or certified by Plaintiff (¶ 51).

46. Knowledge. From November 8, 2017, the Roche Group knew, in the words of its own Legal department, that the coding and scoring criteria of the MMAS are Plaintiff's trade secrets, that every MMAS test must be scored and coded in the Morisky Widget, and that a Morisky Widget license reaching its Affiliates, Genentech among them, was available on terms Roche itself had written. From June 27, 2018, a Roche Group company in the United States held those terms in a license signed by its President and approved as to form by Roche's law department (¶¶ 42–43). Genentech and Roche then administered and scored the MMAS-8 in ILLUMINATE outside the Morisky Widget, with no license from Plaintiff, on scoring guidance supplied by MMAR (¶¶ 17, 51–55, 63).

## E. The Retracted Validation

47. The only published validation of the 2006 printed MMAS-8, Morisky DE et al., J Clin Hypertens 2008;10(5):348–354, claimed 93% sensitivity. Dr. Michael S. Ortiz recalculated it from the paper's own data at about 38% (95% CI 34–41%), so that 62 of every 100 patients who are not taking their medicine are recorded as taking it. (2022) 24 J. Clin. Hypertens. 1390–1391, DOI 10.1111/jch.14353 (Exhibit 4). On August 18, 2023 the Journal retracted the 2008 article. (2023) 25(9) J. Clin. Hypertens. 889, DOI 10.1111/jch.14718 (Exhibit 3). The Morisky Widget's three scores never rested on it.

## F. The MMAR Campaign

48. From October 30, 2021, MMAR and Dr. Morisky announced on www.moriskyscale.com that the Morisky Widget was "phased-out," "defunct" and "DEAD," and Dr. Morisky wrote to Plaintiff's counterparties that MMAR was "the sole owner/licensor of the MMAS 4 and 8 scales." On April 21, 2022 their counsel

wrote that neither Steven Trubow nor Plaintiff "has any lawful right to use or license the MMAS-4 Scale or the MMAS-8 Scale," and MMAR circulated that letter to Plaintiff's licensees on April 22, 2022. Those statements were false.

49. MMAR's permissions. After the Morisky Mandate, MMAR continued to issue paper permissions for the MMAS-8 and MMAS-4 outside the Morisky Widget, over the signature of Donald E. Morisky and through Philip Morisky. They include the paid, written license on which GE HealthCare relies (¶ 63) and the permissions recited in articles co-authored by Philip Morisky, in which the MMAS-8 is described as "copyrighted by Adherence" and "owned by Adherence." None conveys the Morisky Widget, its scoring and coding construction, or any translation.

## THE DEFENDANTS' CONDUCT AND RELATED CONDUCT

### G. Genentech and GE HealthCare — ILLUMINATE: A 6 Called "Medium," a Low Band Cut Off at 5, MMAS-8 Item 8 Collapsed

50. *Study.* ILLUMINATE, NCT05949580 (MN44358), is a prospective observational cohort study of an estimated 500 patients with relapsing-remitting multiple sclerosis, sponsored by Roche with icometrix as collaborator, at seven sites in the United States, Germany and Spain, opened to enrollment on October 21, 2024 — fourteen months after the retraction. Its intervention, icompanion ms, is a participant application with a healthcare-provider portal. Its secondary outcome is "Change From Baseline in Medication Adherence, Assessed by the Morisky Medication Adherence Scale (MMAS)." (Exhibit 5.)

51. *License.* None of Genentech, Roche, icometrix or GE HealthCare holds any license from Plaintiff. The license held by Roche Diabetes Care, Inc. (¶¶ 42–43) does not reach ILLUMINATE; no sub-license was created for it (¶ 45). The registration carries no citation, copyright notice, acknowledgement or permission statement.

52. *Conduct.* Genentech, Roche and icometrix reproduced the MMAS-8 and its scoring construction inside icompanion ms, administered it electronically, on

information and belief also in German and Spanish, scored it there, and delivered the result to treating neurologists through the provider portal. The registry publishes the scoring: a sum “ranging between 0 and 8 points,” “the score of 8” as high adherence, a “score between 6 and 7 as medium adherence” and “scores of 5 and less as low adherence” (¶ 58). The registered scoring departs from the MMAS-8 classification (¶ 35) at both edges of the medium band. First, the 6 called “medium”: a patient who totals 6 has low adherence under the MMAS-8 scoring and coding criteria, and the registered scoring reports her to her neurologist as medium. Second, the low band cut off at 5: the registered low band stops at “5 and less,” so a total of 6, and every total greater than 5 and less than 6 — 5.25, 5.50 and 5.75 — is never reported as low, although each is low under the MMAS-8 scoring and coding criteria. Those fractional totals cannot occur at all under the registered scoring, because a sum in whole-number bands can be produced only by collapsing MMAS-8 item 8 (¶ 59). Every classification that icompanion ms delivered to a neurologist on that scoring carries both defects (¶¶ 57, 60).

53. *No referent.* The registered outcome names no condition and no medication: “Change From Baseline in Medication Adherence, Assessed by the Morisky Medication Adherence Scale (MMAS).” The 2006 printed MMAS-8 itself instructs that it “is a generic adherence scale and the name of the <health condition> … should be substituted in each question.” The paper form has one slot for a single condition, so in a patient taking more than one medicine a generic MMAS-8 score cannot say which medicine is being missed. The Morisky Widget MMAS-8 renders the eight items for each patient’s conditions and medications (¶ 31). ILLUMINATE did not use it.

54. *Device.* icometrix lists “icompanion” with the FDA under establishment registration No. 3013427569 as a Class I device, product code NXQ, “Reminder, Medication,” 21 C.F.R. § 890.5050, with no premarket notification. The United States Agent of record is GE HealthCare Technologies, Inc., Waukesha,

Wisconsin. In ILLUMINATE icompanion does not remind; it administers, scores and classifies the MMAS-8 and reports the result to the neurologist. The FDA Center for Devices and Radiological Health has docketed Plaintiff's allegation of regulatory misconduct as CPT2601952 (Exhibit 6).

55. *Knowledge and continued use. By a registry update submitted July 17, 2026 and posted July 20, 2026, the study is recorded as SUSPENDED for "Transition of study Sponsor"; its subjects, sites and data remain in place. On September 10, 2025 GE HealthCare announced that it had agreed to acquire icometrix; on October 15, 2026 icometrix's General Counsel acknowledged Plaintiff's October 12, 2026 notice of these claims from a gehealthcare.com address. On information and belief GE HealthCare owns and controls icompanion ms, its source code and its participant data, and is liable directly and as icometrix's successor in interest.*

56. *The registry record history.* ClinicalTrials.gov keeps every version of the ILLUMINATE record. (Exhibit 38.) On August 22, 2023, four days after the retraction (¶ 47), the sponsor submitted a version of the record carrying the MMAS-8 outcome and its scoring (¶ 52). Every one of the twenty-six versions submitted from that day through July 17, 2026 carries the same MMAS-8 outcome and the same scoring, unchanged. Every version records ILLUMINATE as a study of an FDA-regulated device and records the product as manufactured in and exported from the United States. From September 2023 to September 2024 the estimated start date was postponed month after month; the actual start date is October 21, 2024. United States sites were added at the Minneapolis Clinic of Neurology, Golden Valley, Minnesota (July 4, 2025), Jersey Shore University Medical Center, Neptune City, New Jersey (October 1, 2025), and Hackensack University Medical Center, Hackensack, New Jersey (December 5, 2025). On October 1, 2025 the completion date was extended to March 31, 2028. The update of July 17, 2026 that recorded the suspension also added two sites in Spain, Hospital General Universitario Dr. Balmis,

Alicante, and Hospital Universitario de Gran Canaria, Las Palmas, removed the Genentech central contact, and withdrew no site and no participant. (Exhibit 38.)

57. *The MMAS-8 tests administered.* The registry schedules the MMAS-8 for each participant at baseline, 12 months and 24 months (Exhibit 5), three tests per participant, or 1,500 tests for the estimated 500 participants through the March 31, 2028 completion date. Between the start of enrollment on October 21, 2024 and the July 17, 2026 suspension, about twenty-one months, each enrolled participant was tested at baseline, and each participant enrolled by July 17, 2025 was due a 12-month test; no participant could reach 24 months. On information and belief, between 500 and 1,000 MMAS-8 tests were administered, scored and classified through icompanion ms before the suspension — about 714 if enrollment proceeded evenly — and each result was delivered to a treating neurologist through the provider portal (¶ 52). Before July 2025 the only open sites were in Dresden and Sinsheim, Germany; the 12-month tests were therefore, on information and belief, administered principally in German, and the baseline tests in English and German. The exact number of tests, by site and language, is in the possession of GE HealthCare and icometrix.

58. **THE REGISTERED SCORING, IN FULL.** The ILLUMINATE record registers the MMAS-8 outcome, "Change From Baseline in Medication Adherence, Assessed by the Morisky Medication Adherence Scale (MMAS)," in these words, unchanged in every version from August 22, 2023 through July 17, 2026 (Exhibits 5, 38):

> "The MMAS 8-item questionnaire is a recognized indicator of medication adherence, consisting of 8 questions with a sum score ranging between 0 and 8 points. The higher score indicates higher adherence to the prescribed therapy recommendation. It has been agreed that the score of 8 could be categorized as having high adherence, score between 6 and 7 as medium adherence and scores of 5 and less as low adherence. A positive

change score will reflect an improvement in the adherence." Time frame: "Baseline, 12 and 24 months."

59. **WORSE THAN RETRACTED: A COUNTERFEIT MMAS-8 SCORING AND CODING CRITERIA.** Genentech and GE HealthCare did not merely use the retracted flat scoring. They altered it into a counterfeit MMAS-8 scoring and coding criteria that matches neither the retracted article nor the Morisky Widget. The three versions, side by side: (a) *The Morisky Widget MMAS-8:* high adherence, a total of 8; medium adherence, greater than 6 and less than 8; low adherence, 6 or below; MMAS-8 item 8 scored in quarter points (¶ 35). (b) *The retracted 2008 article:* "Highly adherent patients were identified with the score of 8 on the scale, medium adherers with a score of 6 to <8, and low adherers with a score of <6," with "a 5-point Likert response for the last item" (Exhibit 42 at 349; see Table IV, Exhibit 42 at 351). (c) *ILLUMINATE:* high adherence at 8; medium adherence "between 6 and 7"; low adherence "5 and less"; MMAS-8 item 8 collapsed into a whole-number "sum score ranging between 0 and 8 points" (¶ 58). ILLUMINATE took the three-band structure and made two changes, each for the worse: it moved the low band down from "<6" to "5 and less," and it collapsed MMAS-8 item 8, a five-point answer to how often the patient has difficulty remembering her medicines, into a whole number, so that totals of 5.25, 5.50, 5.75, 6.25, 6.50, 6.75, 7.25, 7.50 and 7.75 cannot occur. The result is a third construction, built from a substantial portion of the MMAS-8 scoring and coding criteria that are Plaintiff's trade secrets (¶ 166) and altered without Plaintiff's consent: misuse of Plaintiff's trade secrets (¶ 167; Ninth Claim for Relief).

60. **EVERY DEFECT MAKES A PATIENT WHO IS MISSING DOSES LOOK ADHERENT.** The registered scoring has four defects, and each runs the same way: (1) it rests on a test whose only published validation was retracted, with a reconstructed sensitivity of about 38% (¶ 47); (2) it collapses MMAS-8 item 8, discarding the five-point answer before the patient is classified;

(3) its medium band takes in a total of 6, which under the Morisky Widget MMAS-8 is low; and (4) its low band stops at 5, leaving out 6 and every total between 5 and 6, all of which under the Morisky Widget MMAS-8 are low. Defects (3) and (4) work together: the patient who should be classified low is moved into the medium band. That classification is delivered to her neurologist through the provider portal (¶ 52).

61. *Notice to Genentech, June 2026.* On June 6, 2026, Plaintiff sent Genentech's Chief Medical Officer, Dr. Levi Garraway, Genentech's clinical compliance unit and icometrix's chief executive a written complaint concerning ILLUMINATE, enclosing Dr. Ortiz's letter and the 2008 retraction notice. It identified the registry's flat sum "ranging between 0 and 8 points," the reconstructed sensitivity of about 38%, and the risk that multiple sclerosis patients missing doses would be reported to their neurologists as adherent, and it asked that the MMAS-8 scoring be stopped, that the scoring logic be produced, and that treating neurologists be notified (Exhibit 16). On June 19, 2026, Genentech's Senior Litigation Counsel, Cameron C. Vanderwall, answered: "Genentech and Roche take allegations concerning patient safety seriously, and we are conducting a thorough review of your assertions (Case No. HC-26-06-00046)." He directed that all communications concerning Roche and Genentech be sent to him (Exhibit 16).

62. *The suspension and the mootness letter.* By the registry update of July 17, 2026, ILLUMINATE was recorded as SUSPENDED for "Transition of study Sponsor" (¶ 55). On July 20, 2026, Mr. Vanderwall wrote for Genentech and Roche that Plaintiff's concerns were "now moot" because Genentech and Roche were "in the process of terminating their involvement in the ILLUMINATE study" for "business and operational reasons entirely unrelated" to Plaintiff's complaint, that the study was non-interventional, and that questionnaire results were not fed back to treating clinicians. The same day Plaintiff answered in writing, copying Dr. Garraway, that the registry recorded the study as suspended for a sponsor transition,

not terminated; that its subjects, sites and data remained in place; that icometrix markets "the seamless availability of the icompanion data to the health care provider"; and it asked Genentech to confirm the scoring logic applied to the MMAS-8 responses, whether the retraction had been disclosed in the protocol and to the institutional review board, and whether any patient recorded as adherent while having stopped a therapy, and that patient's treating clinician, would be notified (Exhibit 16). Genentech answered none of the three questions. It produced no scoring logic and notified no patient or neurologist.

63. *GE HealthCare's position. GE HealthCare has stated in writing, on behalf of icometrix and GE HealthCare, that icometrix used the MMAS-8 in ILLUMINATE "under a paid, written license from Morisky Medication Adherence Research, LLC ('MMAR')"; that "MMAR identified the MMAS-8 as registered under U.S. Copyright Registration No. TX 8-632-533"; that "MMAR supplied the questionnaire, the translations and the scoring guidance"; and that icometrix "has not licensed, accessed or used the Morisky Widget" (Exhibit 15). GE HealthCare did not dispute that icompanion ms reports each patient's result to the treating neurologist, and it declined every corrective measure Plaintiff had requested, including re-scoring and notification of clinicians.*

64. *What that license was. Registration No. TX 8-632-533 is the 2018 registration of the MMAS-8 form, which Registration No. TX 8-816-517 lists as a previous registration. The forms MMAR claimed were held not copyrightable in the Nevada order (¶ 69), and MMAR could license only what it held. A registration does not make a blank form copyrightable. In Bibbero Systems, Inc. v. Colwell Systems, Inc., 893 F.2d 1104 (9th Cir. 1990), the superbill was registered, and its certificate was prima facie evidence of copyrightability (id. at 1106); the Ninth Circuit nonetheless held it "simply a blank form" designed for "recording services performed" (id. at 1107), affirmed that it "is not copyrightable" (id. at 1108), and held that a single blank form "cannot be copyrightable as a compilation" (id. at*

*1108 n.3). The Nevada court applied Bibbero to the MMAS-4 and MMAS-8 forms MMAR claimed as federally registered. Registration No. TX 8-632-533 conveys no more than Bibbero's certificate did. The scoring guidance that GE HealthCare says MMAR supplied is not part of any form: the Nevada court described the MMAS scoring algorithm as a "method or system" distinct from the forms. It is the scoring and coding construction of the Morisky Widget MMAS-8 (¶ 34), which icometrix and GE HealthCare acquired from a party with no right to disclose it. The difference between the ILLUMINATE scoring and the Morisky Widget's scoring is the defect, not a defense: ILLUMINATE scores multiple sclerosis patients wrongly, sorts them into the wrong categories, and sends those categories to their neurologists.*

65. *The labeling and GE HealthCare's statement. GE HealthCare states that the MMAS-8 is used "not for diagnosis, clinical decision-making or patient management." On information and belief, icometrix's labeling represents that the information icompanion ms monitors "can be used by your doctor to make decisions on your health," and icometrix markets icompanion ms as delivering patient-reported information to the treating neurologist for use in treatment decisions. Both cannot be true. If that statement is true, the labeling is false or misleading in a particular, 21 U.S.C. § 352(a)(1). If the labeling is true, the adherence output informs therapeutic decisions; the clinical-decision-support exclusion of 21 U.S.C. § 360j(o)(1)(E) applies only where the clinician can independently review the basis for the output, and the scoring logic is undisclosed and its published description wrong (¶ 52), so the adherence module is a device used beyond its Class I "Reminder, Medication" listing, with no premarket submission (¶ 54). CPT2601952 is open, and GE HealthCare is the United States Agent of record (¶ 54).*

66. *Why relief cannot wait.* The suspension of ILLUMINATE is voluntary and temporary; its stated reason is a transfer to a new sponsor, after which the MMAS-8 module can resume at any time. The subjects, sites and data remain in place (¶ 55). The classifications already sent to neurologists remain in their records,

uncorrected. GE HealthCare has refused to stop, to produce the scoring logic, to re-score, or to notify a single neurologist (¶ 63). A multiple sclerosis relapse and the disability it leaves cannot be reversed, and no award of money restores a patient's lost neurological function. A trade secret, once disclosed to a new sponsor or site, cannot be recalled.

67. *Notice of these claims. On October 11, 2026, Plaintiff sent Genentech's Assistant General Counsel, Litigation, written notice of the claims alleged here with a draft of this complaint, asked that the patients' results be scored correctly and made available to those responsible for their care, and asked Genentech to preserve all documents, data, scoring files and correspondence relating to the MMAS (Exhibit 16). On October 16, 2026, Plaintiff sent a revised draft naming GE HealthCare and reporting that the FDA Center for Devices and Radiological Health had docketed CPT2601952 (Exhibit 16). Genentech gave no answer on the merits.*

68. *Genentech's response. On October 21 and 22, 2026, Genentech's outside counsel, Alex Reese of Farella Braun + Martel LLP, answered Plaintiff's notice not on the merits but by threatening sanctions and a vexatious-litigant designation if Plaintiff filed this action (Exhibits 12, 16).*

69. *The Nevada decision. On June 25, 2025, in Adherence v. CVS Pharmacy, Inc., No. 2:24-cv-1590 JCM (NJK) (D. Nev.) (Exhibit 11), the court held that the MMAS-4 and MMAS-8 forms claimed by the plaintiff were not copyrightable. Plaintiff was not a party to that action. The plaintiff was "ADHERENCE," on information and belief the name under which MMAR does business (¶ 26). The Morisky Widget, Registration No. TX 8-816-517, was not before that court, and the order does not mention the Morisky Widget, Plaintiff or Registration No. TX 8-816-517. The order states the question as "whether the forms qualify for copyright protection" and holds that the plaintiff's "forms are primarily designed to record information." No court has held Registration No. TX 8-816-517 invalid or unenforceable.*

70. *The same defect, pleaded by MMAR.* In that action MMAR alleged that the MMAS scales used in the defendant's platform "are incorrectly scored and patients are thereby incorrectly counseled," and the court found that the scoring "algorithm appears not to have been used." ILLUMINATE has the same defect: the MMAS-8 is summed as a whole number outside the Morisky Widget, a 6 is reported as "medium," and the classification is sent to the treating neurologist (¶ 55).

71. *The two decisions together.* The Ninth Circuit has held that Plaintiff "remains the registered owner of the Morisky Widget" (¶ 30). Dr. Morisky was a named co-plaintiff in that action and dismissed himself with prejudice before the appeal. The District of Nevada held the MMAS-4 and MMAS-8 forms claimed by MMAR not copyrightable and dismissed that claim with prejudice "based on the works themselves," and on September 15, 2025 every remaining claim of "ADHERENCE d/b/a of MORISKY MEDICATION ADHERENCE RESEARCH LLC" was dismissed with prejudice by stipulated order (No. 2:24-cv-01590-JCM-NJK, Doc. 111). Together, the only enforceable rights are Plaintiff's: the Morisky Widget, the Morisky Widget MMAS-8 and the Morisky Widget MMAS-4. MMAR holds nothing it can license, and a permission issued by MMAR conveys nothing.

72. *Knowledge and willfulness. Genentech continued after written notice of the patient-safety defects since June 6, 2026 (¶ 61) and of each claim since October 11, 2026 (¶ 67). Genentech did not investigate, correct or respond on the merits. Its conduct after notice, while the ILLUMINATE subjects, sites, data and MMAS-8 module remain in place, was knowing, or at minimum in reckless disregard of Plaintiff's rights. It is willful infringement under 17 U.S.C. § 504(c)(2), willful and malicious misappropriation under 18 U.S.C. § 1836(b)(3)(C) and (D), and conduct the Court may weigh in awarding fees under 17 U.S.C. § 505.*

**H. BMS — SIMPLICITY: Scored Outside the Morisky Widget It Licensed**

73. *Study.* SIMPLICITY (NCT01244750, CA180-330), sponsored by BMS with ICON Clinical Research as collaborator, is an observational study of 1,494

patients with chronic myeloid leukemia on dasatinib, imatinib or nilotinib, run from December 2, 2010 to January 8, 2020. Its registered outcomes include "[t]he adherence to treatment" by the "Morisky Medication Adherence Scale - 8 Items," every six months for five years. (Exhibit 7.)

74. *Application.* On October 22, 2018 BMS applied for a Morisky Widget license for SIMPLICITY, naming ICON as the third party that would administer the MMAS-8, 1,494 tests, US-Spanish translation, and administration ten times per patient. To the question "Have you ever used the Morisky Medication Adherence Scales?" BMS answered "No." It asked to begin testing at once, before training.

75. *License.* By the Morisky Widget MMAS-8 License Agreement of February 21, 2019 (the "BMS License"), signed for BMS by Richard Boucher, BMS agreed to pay US$22,500 for a perpetual license, training and certification in Princeton, and 3,000 tests for chronic myeloid leukemia with imatinib, dasatinib and nilotinib. Section 1 permits paper administration, but "all MMAS™ tests must be scored and coded, without exception, through the Morisky Widget™," including tests administered "through a third-party electronic questionnaire"; only personnel trained and certified by Plaintiff may use the Morisky Widget; Section 2(a) makes the coding and scoring criteria trade secrets; Section 2(c) requires the Appendix 1 guidelines in all publications containing MMAS results; Section 2(h) awards attorney's fees to the prevailing party. (Exhibit 8.)

76. *Conduct.* SIMPLICITY administered the MMAS-8 every six months until January 8, 2020. On information and belief, BMS and ICON scored and coded those MMAS-8 tests outside the Morisky Widget, and ICON personnel administering them were not trained and certified by Plaintiff.

**I. UTHealth — The McGovern License: Pregnant Women and Border-Region Diabetics Scored on Bands of Its Own**

77. *The license.* On April 21, 2017, Plaintiff issued a Morisky Widget Perpetual MMAS License for McGovern Medical School. On April 26, 2017, Joseph

Redd, Senior Administrative Manager of McGovern Medical School, returned it to Plaintiff with "a few changes to the license agreement from the UTHealth Procurement Services," asking Plaintiff to approve them. UTHealth's redline made the Licensee "McGovern Medical School at The University of Texas Health Science Center at Houston (UT Health)" and provided: "The Morisky Widget License is for UT Health and cannot be transferred outside of UT Health. Any student, faculty, or staff at UT Health is licensed to use the Morisky Widget, after training and certification by Licensor and purchase of pre-paid MMAS tests" (as revised, the "McGovern License"). (Exhibit 22.)

78. *Its terms.* The McGovern License is perpetual. It permits paper administration only "for their current study," after which paper use entitles Plaintiff to terminate; requires that the MMAS scale legend and required citations of Appendix I "be included in all manuscripts, web postings or other publications containing MMAS descriptions or results"; requires that "[a]ll licensees must submit to MMAS Research all manuscripts that are being considered for publication"; reserves to Plaintiff, "[i]n case of scientific, administrative, or intellectual property misconduct in using the Morisky Widget," the right "to pursue all legal remedies"; and contains the forum provision quoted in ¶ 4. (Exhibit 22.)

79. *Performance.* Plaintiff accepted UTHealth's revisions, and UTHealth performed under the McGovern License. Plaintiff trained and certified UTHealth personnel in Houston, including Dr. Refuerzo (¶ 88). On April 19, 2021, by Invoice No. 7193 to UTHealth's Center for Health Promotion and Prevention Research, Project HOMES, 7000 Fannin St., Suite 2664, Houston, UTHealth agreed to pay Plaintiff $3,500 "for training and certification on the Morisky Widget MMAS-8 UTH McGovern perpetual License." (Exhibit 23.)

80. *Two licenses.* UTHealth holds two Morisky Widget licenses. The first is the McGovern License, obtained through McGovern Medical School's Department of Internal Medicine, Division of Geriatric and Palliative Medicine, for

all of UT Health. The second was obtained in February 2018 through McGovern Medical School's Department of Obstetrics, Gynecology and Reproductive Sciences, for Dr. Refuerzo. On January 24, 2018, Dr. Refuerzo asked Plaintiff "how to officially achieve approval to use this scale in a research project." On February 16–21, 2018, staff of that Department and of McGovern's Medical School Information Technology requested a license and an itemized quote for UTHealth Procurement. On February 22, 2018, the day of Dr. Refuerzo's training in Houston, UTHealth executed a "Retroactive" Morisky Widget license "on behalf of its McGovern Medical School," for "a one-time $3500.00 fee for a retroactive Morisky Widget Software License" (the "Obstetrics License"). In March 2018 Plaintiff invoiced it to the Department's Chairman's Office. (Exhibits 30, 31.)

81. *Separate forum terms.* The Obstetrics License provides that "[a]ll disputes arising under this license contract will be in the Harris County, Texas courts." It was accompanied by a University of Texas "Addendum to Agreement" form, "Last revised 8.25.2017," four months after the McGovern License was made and accepted. Those terms are terms of the Obstetrics License. They are not terms of the McGovern License, and, on information and belief, no writing signed by UTHealth and Plaintiff has modified the McGovern License. (Exhibit 31.)

82. *The Rio Grande Valley, February 2018. On February 20, 2018, during the Morisky Mandate, Plaintiff answered a PhD student at The University of Texas Rio Grande Valley who had asked to use the MMAS, copying Dr. Refuerzo of McGovern Medical School: "The University of Texas has a perpetual Morisky Widget License but will require ON SITE training and certification on the Morisky Widget and the Morisky Medication Adherence Protocol for you to use the MMAS-8 in your study," and offered her free training and certification at McGovern Medical School on February 22, 2018 (Exhibit 27). UTHealth's School of Public Health Brownsville Regional Campus, where the Salud y Vida investigators work, is, on information and belief, on the campus of The University of Texas Rio Grande*

*Valley in Brownsville, and McGovern Medical School was on the Salud y Vida team (¶ 91). Plaintiff does not allege that the offer reached the Salud y Vida investigators.*

83. *The McGovern License in use, June 2018.* On June 16, 2018, Plaintiff wrote to Dr. Holly M. Holmes, Division Director, Geriatric and Palliative Medicine, McGovern Medical School, about an MMAS publication by McGovern authors. Dr. Holmes answered, copying Mr. Burnett, Mr. Redd and Dr. Morisky: "Our coauthor Jason Burnett has a license and has conformed to the necessary requirements." On information and belief, the license to which she referred is the McGovern License (¶¶ 77, 80). (Exhibit 32.)

84. *The publication.* The publication is Cheng MA, Holmes HM, Clark LE, Burnett JL, "Medication adherence and personal determinants of health among self-neglecting older adults," Res Soc Adm Pharm 2018;14(6):e20, by authors of "UT Health McGovern Medical School" (the "Cheng abstract"). It states that "[m]edication adherence was assessed using the Morisky Medication Adherence Scale (MMAS)," and reports MMAS results, by Spearman correlation, for 30 self-neglecting adults aged 65 to 86, a population it describes as "at great risk of adverse outcomes." It contains neither the legend nor the citations that Appendix I of the McGovern License requires. On information and belief, it was not submitted to Plaintiff before publication. (Exhibit 33.)

85. *Gestational diabetes — the studies.* Dr. Jerrie S. Refuerzo, Associate Professor, Division of Maternal Fetal Medicine, UTHealth–McGovern Medical School, administered the MMAS-8 in three UTHealth protocols in pregnant women: HSC-MS-16-0593, "Medication adherence in women with gestational or pregestational diabetes and its effects on pregnancy outcomes"; HSC-MS-18-0425, "E-prescribing in pregnancy: A prospective, observational study"; and HSC-MS-18-0575, "Detemir versus NPH for Type 2 Diabetes Mellitus in Pregnancy: A Comparative Effectiveness Trial." By her written account of January 18, 2019, data collection began November 1, 2016; 227 MMAS-8 tests were given, to 80 women

with gestational diabetes and 147 with pregestational diabetes, at the UTPB and LBJ prenatal clinics; the MMAS-8 was given on paper or through REDCap; surveys were still being collected; and she planned three more protocols, on aspirin, antiretroviral medications for HIV, and psychotropic medications in pregnancy. (Exhibit 25.)

86. *The scoring.* Asked to show the MMAS-8 scoring and coding criteria used, Dr. Refuerzo wrote: "This was incorrect. But we used low adherence < 6. High adherence 7-8. We will be fixing this." That construction eliminates the Morisky Widget MMAS-8 medium band and records a score of 7 as high adherence (¶ 35). Each of those patients is a pregnant woman with diabetes; in each, BOTH MOTHER AND BABY are at great risk.

87. *The abstract.* The results were reported as SMFM Abstract No. 396, "Medication adherence in women with gestational diabetes and its effect on pregnancy outcomes," by Kayla A. Lash, Luz Garcia, Ximena Salazar-Laso, Khalil Chahine, John Hotra, Sean C. Blackwell and Jerrie S. Refuerzo, McGovern Medical School, University of Texas at Houston (UTHealth), for presentation at the Society for Maternal-Fetal Medicine meeting of February 11–15, 2019. On information and belief, the abstract was not submitted to Plaintiff before it was submitted for publication. (Exhibit 25.)

88. *Admission.* On January 2, 2019, Plaintiff wrote to Dr. Refuerzo, with the abstract, about the infringements in her publication. On January 4, 2019, she replied: "I clearly made mistakes." On January 18, 2019, she wrote that "[w]e learned about the copyright information after we began collection," and that "after our discussion, we will enter these results into the widget to ensure that we are capturing and interpreting the data correctly." On January 19, 2019, Plaintiff wrote that she had been "administering the MMAS-8 tests before you signed a Morisky Widget MMAS License and participated in training and certification in Houston," and that "[b]efore you can continue to use the MMAS for any purpose, we will need to execute an Addendum to your Morisky Widget license to remedy breaches in your

Morisky Widget license." She answered: "Thank you. Yes. Will wait for next steps." (Exhibit 25.)

89. *The Addendum.* On April 30, 2019, Plaintiff sent Dr. Refuerzo the Addendum. On May 7, 2019, she wrote: "Yes will proceed with this. Will work with my assistant to get you this." On July 23, 2019, in reply to Plaintiff's follow-up, she wrote: "No we are. Just a busy summer. Will be in touch." In August 2019 Dr. Refuerzo signed the Addendum for UTHealth as "Head of Department," and in September 2019 UTHealth paid for it by wire. The Addendum recites that UTHealth "administered MMAS-8 tests on patients without a valid license from 11-1-16 until 2-2-18 with an invalid MMAS-8 scoring and coding criteria," that the abstract reported "invalid MMAS-8 results based on a counterfeit coding criteria," and that "such conduct constitutes breach of the McGovern Morisky Widget License and Copyright Agreement." It required UTHealth to "re-score and re-code 227 MMAS-8 tests on the Morisky Widget and issue a corrigendum with the correct MMAS Results." On information and belief, the MMAS-8 results were never entered into, re-scored or re-coded in the Morisky Widget, and no corrigendum was issued. (Exhibits 26, 31.)

90. *Reliance.* Plaintiff forbore from suit in reliance on UTHealth's written admission and on its undertakings, through Dr. Refuerzo, to enter the results into the Morisky Widget and to carry out the Addendum.

91. *Salud y Vida — the study.* Salud y Vida is a UTHealth multicomponent intervention for Hispanic adults with poorly controlled type 2 diabetes and comorbid hypertension living along the Texas–Mexico border in the Rio Grande Valley. Its results were published as Lopez JZ, Lee M, Park SK, Zolezzi ME, Mitchell-Bennett LA, Yeh PG, Perez L, Heredia NI, McPherson DD, McCormick JB, Reininger BM, "An expanded chronic care management approach to multiple chronic conditions in Hispanics using community health workers as community extenders in the Rio Grande Valley of Texas," Prev Med 2024;184:107975 (the "Salud y Vida article").

The article analyzes 3,806 participants enrolled between 2013 and 2019, with data collected between 2013 and 2020. Ten of its eleven authors are of UTHealth; Dr. Reininger, of UTHealth's Brownsville Regional Campus, is the corresponding author. The work was supported by the Texas 1115 Medicaid Transformation Waiver Delivery System Reform Incentive Payment Program (CFDA 93.778) and by the National Center for Clinical and Translational Sciences (UL1 TR003167). (Exhibit 24.)

92. *The MMAS-8.* The Salud y Vida article states: "Initially, the Morisky Medication Adherence Scale (MMAS-8) was used. The MMAS-8 questionnaire helped to assess adherence (De las Cuevas C, Peñate W, 2015)." It states that "[p]ermission was obtained to use these validated instruments," and it reports MMAS-8 medication adherence results, including the proportions reporting "high medication adherence" (21.9% vs. 25.3%), and that 57% were missing medication adherence data. On information and belief, the permission referred to was not given by Plaintiff, and the MMAS-8 was administered, scored and coded outside the Morisky Widget.

93. *UTHealth's claimed permission.* By letters of August 5 and August 28, 2025, UTHealth's Office of Legal Affairs stated that permission for UTHealth's use of the MMAS in Salud y Vida "was obtained directly from Professor Donald E. Morisky, including permission to use the Spanish translation," and identified that permission as "two no-fee license agreements directly with Dr. Morisky in 2014 specifically for the Salud y Vida program and Rio Grande study," copies of which it attached. (Exhibits 36, 37.)

94. *Those licenses expired in 2015.* Each of the 2014 agreements is Dr. Morisky's "MMAS-8 License Contract and Copyright Agreement," with The University of Texas Health Science Center at Houston as licensee. The first, for "Understanding medication adherence issues with a group of diabetes patients in a program called Salud y Vida," was signed for UTHealth on July 25, 2014. The

second, for "Evaluate the impact of the Salud y Vida program on medication adherence," covering "the 2 studies that we will be doing using the MMAS questionnaire," was signed for UTHealth on October 30, 2014 and by Dr. Morisky on December 8, 2014. Each provides: "Rights granted under this Agreement to use the Morisky scales terminate one-year from the date below or on termination of Licensee's study, whichever is shorter," and "The license agreement is in effect for a one-year period or the duration of the study, whichever is shorter. If your study is longer than one year, a renewal of license is available based upon a brief status report prior to expiration of the waiver of license fee and copyright agreement." By their own terms both expired no later than December 2015. UTHealth has identified no status report, renewal or later permission. (Exhibit 37.)

95. *The citation and the legend.* For the MMAS-8 the Salud y Vida article cites De las Cuevas C, Peñate W, "Psychometric properties of the eight-item Morisky medication adherence scale (MMAS-8) in a psychiatric outpatient setting," Int J Clin Health Psychol 2015;15(2):121–129, which classifies a score of 6 or 7 as medium adherence, a construction that is not the Morisky Widget MMAS-8 scoring and coding, in which the eighth item is converted into quarter-point values (¶¶ 34–35). The article contains none of the citations, and not the legend, that Appendix I of the McGovern License requires. On information and belief, the manuscript was not submitted to Plaintiff before publication.

96. *The scoring and coding.* The Salud y Vida article reports the MMAS-8 results of 1,616 participants in three bands — low adherence (543, 33.60%), medium adherence (585, 42.45%) and high adherence (387, 23.95%) — without stating how they were scored and coded. On information and belief, they were scored and coded by the method of the only MMAS-8 source the article cites, De las Cuevas and Peñate (¶ 95), which states: "Each 'no' response is rated as 1 and each 'yes' response is rated as 0 except for item 5, in which each 'yes' response is rated as 1 and each 'no' response is rated as 0"; "For Item 8, the code (0-4) has to be standardized by

dividing the result by 4 to calculate a summated score"; and "Total scores on the MMAS-8 range from 0 to 8, with scores of 8 reflecting high adherence, 7 or 6 reflecting medium adherence, and <6 reflecting low adherence." Its medium band of "7 or 6" omits the totals of 7.75, 7.50, 7.25, 6.75, 6.50 and 6.25 that its own MMAS-8 item 8 rule produces. Each Salud y Vida participant's MMAS-8 result was thus scored and coded outside the Morisky Widget by a method that is not the Morisky Widget MMAS-8 scoring and coding. (Exhibits 24, 35.)

97. *No Morisky Widget use.* Plaintiff's Morisky Widget records show a single UTHealth account, "McGovern Medical School-UTHealth," opened in February 2018, whose users recorded 103 tests in all, 10 by Dr. Refuerzo and 93 by John Hotra. No author of the Salud y Vida article, of the Zolezzi article or of the Cheng abstract ever held a Morisky Widget account, and no MMAS-8 test of Salud y Vida or of the Cheng abstract was administered, scored or coded in the Morisky Widget. (Exhibit 34.)

98. *Knowledge.* UTHealth knew the terms of the McGovern License from April 2017; was told in writing in January 2019 that every further use of the MMAS-8 required the Morisky Widget and an Addendum to cure its prior use (¶¶ 88–89); and in April 2021, through its Center for Health Promotion and Prevention Research — the center of Dr. Yeh, an author of the Salud y Vida article — agreed to pay for training and certification under the McGovern License (¶ 79). That is the year the Zolezzi article was published (¶ 91). The Salud y Vida article was published in July 2024, eleven months after the retraction (¶ 47).

**J. Shinn, MD Anderson, Wolff and Johns Hopkins — PALLAS: A Fifth Item, and 9,031 Tests Reduced to "5 or Less Than 5"**

99. *The article.* Shinn is the lead and corresponding author of Shinn E, Zahrieh D, DeMichele A, et al., "Impact of adding palbociclib on treatment adherence to ongoing adjuvant endocrine treatment in the global randomized PALLAS randomized trial in patients with early breast cancer," Breast Cancer Res

Treat 2025;211:385–397, published online March 27, 2025, which gives her affiliation as The University of Texas MD Anderson Cancer Center, Houston (Exhibit 40). PALLAS (NCT02513394) is a phase 3 trial of palbociclib added to adjuvant endocrine therapy in patients with hormone receptor-positive early breast cancer. The article's adherence analysis included 4,688 of the 5,796 PALLAS participants (Exhibit 40 at 385).

100. *The MMAS-5.* The article states that patients "completed the Morisky Medication Adherence Scale-4 plus an additional item" at cycles 2, 3, 6, 12, 18 and 24, on "modified MMAS-4 and McHorney adherence paper questionnaires." The added item is: "All things considered, did you actually take your (Palbociclib/ Anti-hormone pill) exactly as directed by your doctor?" "Scores from the five items were summed to create a total Morisky composite score, ranging from 0 to 5, with a maximal score of 5 considered 'most adherent.'" The analysis compared "maximal adherence scores on the modified short-form Morisky (score = 5 vs. score < 5)," and Table 3 defines "Composite Morisky = MMAS-4 + whether the doctor's instructions for palbociclib/ET were followed exactly." (Exhibit 40 at 385, 387, 391.) The article thus published, under the name of the MMAS-4, a five-item instrument — an "MMAS-5" — scored as a sum from 0 to 5 and coded as a two-group dichotomy.

101. *Taken, misused and disclosed.* The article itself shows what was taken. Its Methods state that the MMAS-4 "assessed intentional and unintentional medication-taking behaviors using a dichotomous yes/no response format" (Exhibit 40 at 387) — the derivation of the intentional and unintentional non-adherence scores, which is part of the scoring and coding criteria that are Plaintiff's trade secrets (¶¶ 34, 166). Its Methods limit the intention-to-collect population to the languages in which "[v]alidated translations of the Morisky medication adherence scale-4item (MMAS-4) were available in English, Spanish, and German" (Exhibit 40 at 386) — the language-specific rendering architecture (¶ 34). The authors took the four MMAS-4 items, their yes/no coding and their division of intentional from

unintentional non-adherence — a substantial portion of the trade secrets — and changed them in three ways: they added a fifth compliance item; they summed the five items into a score from 0 to 5; and they recoded that score into two groups, "score = 5 vs. score < 5" (Exhibit 40 at 387). The MMAS-4 scoring and coding criteria classify adherence as low, medium or high and keep intentional non-adherence separate from unintentional non-adherence (¶ 34). The article discarded both: it reports no intentional score and no unintentional score. Under "< 5," a patient who stopped her palbociclib because of neutropenia is the same as a patient who forgot a dose, and a medium-adherent patient is the same as a low-adherent patient. That is misuse of the trade secrets, and misuse is misappropriation by use (¶¶ 167, 191).

102. *The scale of the misuse: 9,031 invalid MMAS-5 tests.* Table 3 alone reports N values for the palbociclib Morisky composite of 1,773, 1,781, 1,744, 1,511, 1,280 and 942 at the six cycles — 9,031 MMAS-5 tests (Exhibit 40 at 391). Each is an invalid test: a five-item composite validated in no language (¶ 109), scored as a sum from 0 to 5, coded as "5" or "< 5," with no intentional score, no unintentional score and no medium band (¶¶ 100–101). Each of the 9,031 invalid MMAS-5 tests is a misuse of the trade secrets. The MMAS-5 tests for endocrine therapy are additional (Exhibit 40 at 391).

103. *The MMAS-4 classification discarded.* The MMAS-4 scoring and coding criteria classify the four MMAS-4 items into three bands: low adherence, a score of 0 or 1; moderate adherence, a score of 2 or 3; and adherent, a score of 4 (¶ 34). The article replaced that classification with a sum from 0 to 5 (¶ 100; Exhibit 40 at 387, 391), then collapsed the sum into two groups, "score = 5 vs. score < 5." (Exhibit 40 at 387.) The moderate band is gone, and a patient one answer short of perfect is counted with a patient who answered no question in the adherent direction.

104. *Two medicines in one question.* The added item asks about two different medicines at once: "All things considered, did you actually take your (Palbociclib/

Anti-hormone pill) exactly as directed by your doctor?" (Exhibit 40 at 387.) On information and belief, palbociclib and anti-hormone pills work in distinct ways, on different schedules, with different toxicities, and a single yes or no cannot say which of the two a patient did not take, or why.

105. *BENEFICENCE — THE INCREASED RISK OF DEATH AND HARM.* BENEFICENCE is the obligation the authors owed every one of the 4,688 patients in the intention-to-collect population (Exhibit 40 at 387): the affirmative duty to act for their benefit and to protect them from harm. It is owed at the level of each measurement put in front of each patient, because a measurement that hides a drug injury does not merely fail to help the patient — it prevents the clinician who could help her from ever seeing it. On information and belief, the PALLAS trial observed 176 deaths during the study period: 100 deaths (3.5%) among patients receiving palbociclib plus endocrine therapy, and 76 deaths (2.6%) among patients receiving endocrine therapy alone — a death rate about 35% higher in the palbociclib arm. On information and belief, serious adverse events were reported in 13% of the palbociclib group and 7.9% of the control group — a rate about 65% higher in the palbociclib arm — and 92% of patients on palbociclib and 89.7% of patients on endocrine therapy alone experienced at least one adverse event. On information and belief, the PALLAS investigators reported that medication non-adherence was a significant issue and likely contributed to adverse events, including early death. Those are the women the MMAS-5 measured. In the arm with the higher rates of death and serious harm, a woman who stopped her palbociclib because of its toxicity was scored "< 5" beside a woman who forgot a dose, with no intentional score to tell her clinician that the drug, not the patient, was the cause (¶ 101). On information and belief, the higher rates of adverse events and death in the palbociclib group, and the adverse events and deaths in the endocrine-therapy group, may be attributed in part to the failure of the MMAS-5 to measure adherence to a multiple-medication

regimen, and each of the 9,031 palbociclib tests (¶ 102) placed the woman tested at increased risk of death and harm.

106. *Responsibility.* The article states: “The content is solely the responsibility of the authors.” (Exhibit 40 at 394.)

107. *The cover-up.* On February 18, 2026, Breast Cancer Research and Treatment published a correction that states, in its entirety as to the MMAS-5: “The authors have corrected this article to remove the use of the Morisky measure.” Figures 1 and 2 “have been updated,” Table 3 “has been modified to remove the Morisky Composite Scale,” and “[p]arts of the Methods and Results text have been updated.” It states: “The original article has been corrected.” (Exhibit 41.) The correction gives no reason for removing the MMAS-5. It does not report a single MMAS-4 result correctly scored. It does not tell any patient or treating clinician that 9,031 palbociclib tests, and the endocrine-therapy tests besides, were scored on a counterfeit five-item composite (¶¶ 100–102). Yet the same notice states that “the conclusions of the article remain valid/the conclusions of the article have not been changed” (Exhibit 41) — including the conclusion that adding palbociclib does not reduce adherence and “may be reassuring to clinicians” (¶ 109; Exhibit 40 at 393), which rested in part on the MMAS-5 the authors removed. The administrations, the “< 5” classifications of women with early breast cancer, and the nearly eleven months of publication from March 27, 2025 to February 18, 2026 were not undone; only the evidence of how they were scored was taken from public view. Removing the results is not a correction of them. It covers up the violation of beneficence (¶ 11). BENEFICENCE: by dropping the MMAS-4 results, the correction left every woman scored “< 5” — in an arm whose death rate was about 35% higher and whose serious adverse-event rate was about 65% higher (¶ 105) — unidentified to her treating clinician, while leaving standing the conclusion that clinicians may be “reassur[ed].” On information and belief, the correction put the women of PALLAS,

and the patients whose clinicians rely on the article, at continuing risk of death and harm.

108. *The records destroyed.* Under the correction (¶ 107; Exhibit 41), on information and belief, the version of record now published in the authors' names no longer contains the original Figure 1, Figure 2 or Table 3, or the Morisky results reported in them, and those published records have been destroyed. They survive in this record only because Plaintiff preserved the article as it was published on March 27, 2025 (Exhibits 40, 49). On information and belief, the destruction of those records removed from public view the only published picture showing that the arm with the higher rates of death and serious harm was scored as the more adherent arm, and left every woman scored "< 5" unidentified to her treating clinician, at continuing risk of death and harm, in violation of BENEFICENCE (¶¶ 105, 107).

109. *The article's own words: what the authors knew.* The authors knew that the MMAS-4 may be administered only in a validated form. They confined the intention-to-collect population to the languages with validated MMAS-4 translations (¶ 101; Exhibit 40 at 386), and they wrote that "it is recommended that validated patient-reported adherence measures be included whenever possible" (Exhibit 40 at 393). They knew that the MMAS-4 separates intentional from unintentional non-adherence; they said so (Exhibit 40 at 387). They then administered a five-item composite validated in no language, reported neither an intentional nor an unintentional score, and published the composite under the name of the MMAS-4. They knew their adherence values were compromised: "these values may be misleadingly high," because the data "did not include patients who had stopped taking their medication" (Exhibit 40 at 394). On that measure they published a clinical conclusion: "The findings in this analysis counter a longstanding concern that managing multiple medication regimens and toxicity profiles will reduce patient adherence, which may be reassuring to clinicians considering the use of targeted therapies in combination with ET." (Exhibit 40 at 393.)

110. *MD Anderson.* The PALLAS adherence article gives the affiliation "The University of Texas MD Anderson Cancer Center, Houston, TX, USA" for Shinn, its lead and corresponding author, who gives her address as eshinn@mdanderson.org, and for its co-author William Fraser Symmans (Exhibit 40). The February 18, 2026 correction gives the same affiliation for Shinn (Exhibit 41). On information and belief, Shinn and Dr. Symmans took part in PALLAS and in its adherence analysis as members of the MD Anderson faculty, within the scope of their employment by MD Anderson.

111. *Notice to MD Anderson, May 31, 2026.* On May 31, 2026, Plaintiff sent a written complaint concerning the PALLAS adherence analysis to MD Anderson's Institutional Compliance office, its Institutional Review Board and Shinn. On June 3, 2026, MD Anderson's Research Integrity Officer, Dr. Kristyn U. Sorensen, wrote that she had "documented, assigned a case number, and initiated an assessment." On June 8, 2026 she acknowledged Plaintiff's supplement: "This information will be included in the record and in MD Anderson's review." On information and belief, MD Anderson holds no Morisky Widget license, has corrected no MMAS-4 result, and has notified no patient or clinician.

112. *Wolff and Johns Hopkins.* Wolff is a co-author of the PALLAS adherence article, which lists him among its authors with the affiliation "Johns Hopkins University/ECOG, Baltimore, MD, USA" (Exhibit 40). The article states that its content "is solely the responsibility of the authors" (¶ 106). On information and belief, Wolff took part in PALLAS and in its adherence analysis as a member of the Johns Hopkins faculty, within the scope of his employment by Johns Hopkins.

113. *Notice to Wolff and Johns Hopkins, June 15, 2025.* On June 15, 2025, Plaintiff's managing member wrote to Wolff at his Johns Hopkins address, copying a second Johns Hopkins address, that the PALLAS article had modified the MMAS-4 into a five-item "MMAS-5" across more than 10,000 tests, asked whether Johns Hopkins held a license, and stated that Plaintiff was reaching out to Johns Hopkins

to settle the matter or file a complaint. On information and belief, neither Wolff nor Johns Hopkins answered, and neither holds a Morisky Widget license.

114. *The correction, after notice*. Eight months later, on February 18, 2026, the correction was published in the names of the article's authors, Wolff among them: "The authors have corrected this article to remove the use of the Morisky measure" (¶ 107; Exhibit 41). It was issued after Wolff and Johns Hopkins had written notice of the misuse. It did not correct a single MMAS-4 result, notify a single patient or clinician, or withdraw the conclusions; it removed the record of how the women of PALLAS were measured (¶ 107).

115. *What Wolff and Johns Hopkins knew*. The article's own words — the confinement of the MMAS-4 to its validated translations, the recommendation of validated measures, and the description of the MMAS-4's division of intentional from unintentional non-adherence — are the words of each of its authors, Wolff among them (¶ 109). Johns Hopkins had known since 2017 that the MMAS scales may be used only under license, and its General Counsel had handled Plaintiff's claims since August 11, 2021 (¶¶ 126–134). **While it knew all of this, Johns Hopkins was running a Department of Defense trial on wounded patients with the retracted MMAS-8, and it still is.** In POvIV2 (NCT05699174), 250 patients with infected fractures that did not heal are randomized, and half must take oral antibiotics themselves, at home, alone, for up to six weeks (¶¶ 136–137). POvIV2 measures whether they take them with the MMAS-8, scored outside the Morisky Widget, on the retracted rule that a score of 6 is adherent (¶¶ 136–143). A score of 6 is low adherence. A patient who stops her antibiotic is recorded as adherent and appears in the data as a patient in whom oral antibiotics failed; the infection survives the course and learns resistance. An infected nonunion that is not cleared is not a data point. It is a limb. The answer POvIV2 produces will be used to decide how wounded service members with infected fractures are treated (¶ 143). Johns Hopkins was told in writing on June 7 and July 9, 2026, acknowledged receipt on July 20,

2026, and on September 9, 2026 updated the trial record and left the MMAS-8 endpoint unchanged (¶ 152). When Plaintiff took the matter to the Department of Defense, the Department answered in seven days: on October 26, 2026, the Defense Health Agency's Director of Research and Regulatory Compliance wrote that the Department "will discuss the below further with JHU" (¶ 12). In 120 days, Johns Hopkins has sent Plaintiff nothing but a receipt. POvIV2 is still recruiting (¶ 152).

**K. ResMed — actensio: The Retracted 2008 Cut-Points, Eleven Months After the Retraction**

116. *actensio and ResMed.* actensio is, in the words of the actensio article (¶ 122), "a CE marked digital application that offers various modules for controlling high blood pressure and promoting a healthy lifestyle via app or web-browser," including a module on "medication adherence" (Exhibit 43 at 904). The trial's registration calls it "a CE certified medical device." On information and belief, ResMed acquired mementor DE GmbH, Leipzig, Germany ("mementor"), and with it actensio, in August 2022, has since owned mementor as a wholly owned subsidiary (the "ResMed subsidiary," ¶ 24), and has directed and financially benefited from actensio and the evidence offered for it.

117. *Not listed with the FDA.* mementor is registered with the U.S. Food and Drug Administration as a device establishment, Registration No. 3045855290, listing one device, a "Computerized Behavioral Therapy Device For Insomnia." Its designated United States Agent is David Lanfranchi, ResMed Inc., 9001 Spectrum Center Boulevard, San Diego, California 92123. A search of the FDA Establishment Registration and Device Listing database for the name "actensio" returns no result.

118. *The trial, and what it registered.* mementor registered the trial on September 1, 2022 as DRKS00030109, naming itself sponsor and source of funding: a monocenter, randomized, interventional trial, recorded as "Phase III," for the purpose of "Treatment," at the Ruhrlandklinik, Zentrum für Schlaf- und Telemedizin, Essen, with Prof. Dr. Christoph Schöbel as principal investigator. One

hundred and two adults with hypertension were randomized; patients on four or more antihypertensive agents were excluded, so that participants took up to three; the trial was conducted fully remotely, with online questionnaires. The registered outcomes are blood pressure, pulse and the PAM-13 questionnaire. The MMAS-8 was never registered as an outcome; it appears for the first time in the published article. The registration states that individual participant data will not be shared.

119. *Where the MMAS-8 came from: the derivative German MMAS-8.* The actensio article's only authority for the MMAS-8 is a German translation: Arnet I, Metaxas C, Walter PN, Morisky DE, Hersberger KE, "The 8-item Morisky Medication Adherence Scale translated in German and validated against objective and subjective polypharmacy adherence measures in cardiovascular patients," J Eval Clin Pract 2015;21:271–277 (Exhibit 43 at 911, ref. 25). On information and belief, mementor took that German MMAS-8, rendered it into its own online questionnaire, on the platform through which it runs actensio and its trials, and administered it in German, online, to the trial's patients. That questionnaire is a derivative German MMAS-8, prepared, reproduced and administered without any license from Plaintiff.

120. *The translators' own warnings.* On November 3, 2017, Prof. Kurt E. Hersberger of the University of Basel, an author of that translation, wrote to Plaintiff: "[w]e are fully aware that beginning January 2017, data collection of any MMAS-8 scale must use the Morisky Widget"; and on November 28, 2017 he wrote to attorney Kenneth I. Gross that "we are fully aware that any future use of the MMAS scale needs a license." In 2024 the translation's authors wrote that "the MMAS-8 was not designed to assess adherence to polypharmacy." J Eval Clin Pract 2024;30(4):582–583, DOI 10.1111/jep.13975.

121. *The trial site's own license.* The trial's principal investigator and corresponding author, Prof. Schöbel, is of Universitätsmedizin Essen, Ruhrlandklinik, with an address at uk-essen.de. By a Morisky License Contract and Copyright Agreement signed by Dr. Morisky on August 2, 2016, University Hospital

Essen took a license for 176 MMAS-4 and 176 MMAS-8 administrations, "ONE TIME ONLY," for a single melanoma study, and paid for validated translations including German. In it the licensee agreed that "[c]oding and scoring criteria of the MORISKY are trade secrets of the Owner and as such cannot be divulged in any publication or report without the Owner's prior written permission"; that a validated translation "is non-transferrable and is linked to a specific license agreement"; and that "jurisdiction in and venue for any infringement (if any at all) will take place in Los Angeles." That license expired no later than July 14, 2017, five years before the actensio trial enrolled its first patient.

122. *The article, eleven months after the retraction.* On July 11, 2024 — eleven months after the Journal of Clinical Hypertension retracted the 2008 validation (¶ 47) — the results were published in that same journal: Wildenauer A, Maurer LF, Rötzer L, Eggert T, Schöbel C, "The effects of a digital lifestyle intervention in patients with hypertension: Results of a pilot randomized controlled trial," J Clin Hypertens (Greenwich) 2024;26(8):902–911, DOI 10.1111/jch.14811, PMID 38992970, published by Wiley and distributed in the United States, including through PubMed Central, PMC11301437 (the "actensio article") (Exhibit 43). The article's conflict-of-interest statement records that two of its authors "are salaried employee[s] of the mementor DE GmbH" and that Prof. Schöbel "is a medical consultant of the mementor DE GmbH" (Exhibit 43 at 910). It calls the MMAS-8 "validated" and does not mention the retraction.

123. *The retracted 2008 cut-points, and the 38% blind spot.* The 2008 article stated: "Using a cutpoint of <6, the sensitivity of the measure to identify patients with poor blood pressure control was estimated to be 93%" (Exhibit 42 at 348), and classified "medium adherers with a score of 6 to <8, and low adherers with a score of <6" (Exhibit 42 at 349; see Table IV, Exhibit 42 at 351). Dr. Ortiz recalculated that sensitivity at about 38%, and the article was retracted (¶ 47; Exhibits 3, 4). The actensio article adopted those cut-points word for word, renaming "medium" as

"moderate": "The MMAS-8 score ranges from 0 to 8, with a score of <6 indicating low adherence, 6 to <8 indicating moderate adherence, and 8 indicating high adherence" (Exhibit 43 at 905). Under the MMAS-8 scoring and coding criteria a total of 6 is low (¶ 35); the actensio article calls it moderate, widening a blind spot already shown to miss most non-adherent patients. It never states how MMAS-8 item 8, the five-point question, was scored.

124. *Conduct — the device and the trial.* mementor, through its two salaried employees and its medical consultant, reproduced the derivative German MMAS-8 and its scoring and coding construction in its online questionnaire; administered it to ninety patients at baseline and at three months — up to 180 MMAS-8 tests — with no clinician present; scored every test outside the Morisky Widget on the retracted 2008 cut-points; stripped from every test the legend and copyright notice that accompany every authorized Morisky Widget MMAS-8 test; and used the result as evidence for its own product, which contains its own medication adherence module, measuring with the MMAS-8 the very outcome actensio is sold to improve. It published that evidence in a United States journal, distributed in the United States through PubMed Central. Neither ResMed nor mementor holds any license from Plaintiff; no person who administered or scored the MMAS-8 was trained or certified by Plaintiff; and the actensio article carries no copyright notice, legend, permission statement or license. From January 1, 2017, every MMAS-8 test was required to be administered, scored and coded in the Morisky Widget (¶¶ 32–33).

125. *Knowledge, and the harm continues.* mementor's employees chose to publish in the very journal that had retracted the validation eleven months earlier (¶¶ 47, 122). The translators had acknowledged in writing in 2017 that any MMAS-8 use required the Morisky Widget and a license (¶ 120). The trial site had agreed in writing in 2016 that the scoring and coding criteria are trade secrets and that its German translation is non-transferable (¶ 121). On information and belief, ResMed, as owner of mementor and of actensio, directed and financially benefited from the

trial, which supports the commercial position of actensio as a prescription digital therapeutic, and had the right and ability to supervise the conduct alleged. On October 24, 2026 Plaintiff submitted a complaint and proposal for retraction of the actensio article to its publisher, which logged it as case 309503; on October 30, 2026 Plaintiff gave ResMed written notice of these claims, which ResMed logged as Case No. 08395850. On information and belief, no MMAS-8 result of the actensio trial has been re-scored or re-coded in the Morisky Widget, no participant's clinician has been told that a score of 6 was reported as moderate adherence, and the article has not been corrected.

**L. Johns Hopkins — Four Periods, One Course of Conduct: The Morisky Mandate, the CR2A, the Retraction and the Invalidation**

**Period 1 — The Morisky Mandate (November 8, 2017 – December 3, 2020)**

126. *No permission, admitted.* On November 8, 2017, Dr. Kristin Riekert, Director of the Johns Hopkins Adherence Research Center, wrote to Dr. Morisky and Plaintiff's managing member that her NIH-funded study of 128 adolescents with chronic kidney disease (R01DK092919) had used the Morisky scale under a permission document issued "for a colleague to use it for an unrelated study … and not for this specific study," and that "[i]f we did not [obtain permission], I am embarrassed and apologize for this error."

127. *Johns Hopkins asked how to license the MMAS-8, and was told.* In October 2018 a Johns Hopkins pulmonary investigator, in November 2018 a Johns Hopkins Bayview physician, and in January 2020 Johns Hopkins Outpatient Pharmacies each asked Plaintiff how to obtain permission to use the MMAS-8, and each was given Plaintiff's licensing terms, including a perpetual Morisky Widget license with training. None took a license. On information and belief, no Johns Hopkins school, department, center or investigator holds a Morisky Widget license.

128. *Breathe and SLOW-BWL, 2020.* In August 2020 Plaintiff's managing member wrote to Johns Hopkins investigators and the Patient-Centered Outcomes

Research Institute about the scoring and coding of the MMAS-8 in the Johns Hopkins Breathe study of patients with chronic obstructive pulmonary disease. On October 18, 2020, Plaintiff's managing member sent Dr. Jenni Sheng, investigator of the Johns Hopkins SLOW-BWL trial, NCT04499950, its registered outcome, "MMAS (scores range 0-4 with higher scores indicating better treatment adherence)," and asked for her license. On October 20, 2020, she answered: "After some serious discussion, we have decided not to use MMAS and will be using an institutional drug diary for drug monitoring. We will modify clinicaltrials.gov to reflect this change." Told that the matter was going to counsel investigating several Johns Hopkins researchers, she wrote that evening: "Fortunately we have not used the questionnaire at all as our study has not been opened yet." (Exhibit 52.) When a Johns Hopkins investigator was told before a single patient was tested, she stopped. POvIV2 did not (¶ 145).

129. **The X factor: Johns Hopkins's own words on what missed doses do. A National Institute of Nursing Research grant to the Johns Hopkins School of Nursing, F31NR017328 (September 1, 2017 – June 30, 2020), used the MMAS-8 to evaluate cardiac medication adherence in 200 heart-attack patients at Johns Hopkins Hospital and Johns Hopkins Bayview Medical Center, and stated why it matters: "Among patients following an AMI, nonadherence to cardiac medications can result in up to a 40% increase in re-hospitalization and an 80% increase in mortality." (Exhibit 53 at 2–3.) On information and belief, that MMAS-8 was administered outside the Morisky Widget and without a license. The grant is claim No. 256 of the CR2A (¶ 130).**

**Period 2 — The CR2A (December 4, 2020 – August 17, 2023)**

130. *The CR2A.* Plaintiff and its managing member, Dr. Donald E. Morisky and Morisky Medication Adherence Research, LLC, among others, executed an agreement under Washington Civil Rule 2A, dated December 4, 2020 (the "CR2A"). Its Exhibit 3 lists claims from which a claim settlement may be sought, including

four Johns Hopkins entries: Dr. Aboumatar (No. 61), NCT04499950 (No. 151), and the Johns Hopkins investigators Jenni Sheng and Erin Murdock Spaulding (Nos. 239 and 256). In paragraph 4 of the CR2A, "Donald Morisky authorizes MMAS Research, LLC through its attorney(s) to prosecute the Claim Settlements listed in Exhibit 3 … related to the MMAS-4, MMAS-8, the Morisky Widget and any related intellectual property, and further agrees to cooperate in any existing investigations, claims and ensuing litigation of any such claims." (Exhibits 10, 44.)

131. *The Infringement Authorization of January 25, 2021.* On January 25, 2021, Dr. Morisky and his counsel, F. Christopher Austin of Weide & Miller, Ltd., signed an Infringement Authorization: "In accordance with the December 4, 2020, agreement between Dr. Morisky and Steve Trubow and MMAS Research, LLC, I, Dr. Donald E. Morisky hereby authorize Steve Trubow, MMAS Research, LLC, or any attorney working on their behalf or designated by either of them to represent my interests in pursuing, settling and litigating any claim I have for infringement of my intellectual property rights to the MMAS-4, MMAS-8, and Morisky Widget, as well as contract claims related to licenses issued to use the MMAS-4, MMAS-8 or Morisky Widget, accruing on or before December 3, 2020." The Authorization contains no term permitting its withdrawal. (Exhibit 9.)

132. **The Breathe report: Johns Hopkins's own words. Johns Hopkins University's 2020 final report to the Patient-Centered Outcomes Research Institute on the BREATHE study, PCORI ID IH-1304-7118, measured 168 patients with chronic obstructive pulmonary disease discharged from hospital with the MMAS-8 on scoring it states as "high adherence = 0; medium adherence = 1 or 2; and low adherence >2 … a higher score means lower adherence," citing the 2008 article later retracted (Exhibit 51 at 50; Exhibit 42). That scoring is upside down, places a total of 6 — low adherence — in the medium band, and reports only averages that classify no patient (¶ 35). Confronted in June and August 2021, Johns Hopkins corrected nothing;**

**instead, on September 2, 2021, its lawyers claimed that Johns Hopkins owns the MMAS-8 and MMAS-4 (¶ 134; Exhibit 45, item 3). On May 30, 2023, its METRC Coordinating Center began POvIV2, a Department of Defense trial, on the rule that a score of 6 — low adherence — is adherent (¶¶ 136–138).**

133. *Johns Hopkins's General Counsel.* On August 11, 2021, Stephanie Shea, Senior Associate General Counsel and Chief Compliance Officer of The Johns Hopkins University, wrote to Plaintiff's then counsel: "I am counsel to the Johns Hopkins University. Please direct all future correspondence regarding the below-referenced matter to me." On August 13, 2021 Plaintiff's then counsel sent her ten written questions — the MMAS-8 form administered, its translations, the dates, the number of patients and tests, paper or electronic administration, the locations, the scoring and coding used, who holds the results, and every publication. On information and belief, none was answered. Ms. Shea hosted a call with Plaintiff's managing member and its then counsel on September 2, 2021 (¶ 134), and a further call with her and Mr. Tymoczko was set for April 12, 2022. (Exhibit 45, items 1 and 5.)

134. *Johns Hopkins claims the MMAS-8.* On September 2, 2021, on a call hosted by Ms. Shea, Johns Hopkins's counsel asserted that the MMAS-8 and MMAS-4 are derivatives of a six-item test of Green, Levine and others, developed by employees of Johns Hopkins, and that Johns Hopkins therefore owns them. That afternoon Plaintiff's managing member recorded in writing that Johns Hopkins "asserted that you took the 1979 Green Levine 6 item test and created two derivatives the MMAS-8 and MMAS-4 that JHU owns the copyrights," and "[t]hey said you own nothing," and Plaintiff's then counsel recorded: "they claim the MMAS-4 and -8 are just derivatives of the 6-question test from Levine et al. And because of that, JHU believes they own the -4 and -8, because it the 6-question test was developed by employees of JHU." Johns Hopkins thus takes a third position on the same

MMAS-8, beside Genentech's and GE HealthCare's (¶ 71), and none of the three is a license from Plaintiff. (Exhibit 45, items 2–3.)

135. *The claims stopped.* Dr. Morisky's emails of April 14 and 15, 2022 — in breach of paragraph 4 of the CR2A and of the Infringement Authorization of January 25, 2021 — told Johns Hopkins's General Counsel that Plaintiff did not represent him on the Johns Hopkins claims and that corrective measures ran through him alone, and the prosecution of the Johns Hopkins claims under the CR2A could not go forward. On information and belief, Johns Hopkins took no license and made no correction, and the MMAS-8 continued in use at Johns Hopkins outside the Morisky Widget.

136. *POvIV2 begins.* On May 30, 2023, POvIV2 began. "PO vs IV Antibiotics for the Treatment of Infected Nonunion of Fractures After Fixation" ("POvIV2"), ClinicalTrials.gov NCT05699174, is a two-arm, randomized, multicenter Phase III trial. Its lead sponsor and responsible party is METRC; its collaborator is the United States Department of Defense. Its principal investigators are Dr. William Obremskey of Vanderbilt University Medical Center and Dr. Castillo of the Johns Hopkins Bloomberg School of Public Health. It has an estimated enrollment of 250 at thirteen listed sites, and is recruiting.

137. *The patients.* The patients here are the 250 patients to be enrolled in POvIV2: adults whose fracture was fixed and did not heal, because it is infected. They are randomized to intravenous antibiotics, given to them, or to oral antibiotics, which they must take themselves, at home, alone, for up to six weeks.

138. *The MMAS-8 endpoint.* The registered outcome measure states that adherence "will be measured by the Morisky Medication Adherence Scale (MMAS-8)," that "[q]uestion 8 is measured using a 5-point Likert scale," and that "[s]cores are summed from 0-8 with a 6 or more being considered as adherent to the medications."

139. *A score of 6 is low adherence.* On the Morisky Widget MMAS-8 bands, low adherence is 6 or below (¶ 34). The POvIV2 rule records every patient scoring 6 — a low adherer — as adherent. Its flat sum has nowhere to put the quarter-point totals that MMAS-8 item 8 produces, and it does not reverse-code MMAS-8 item 5.

140. *The scoring and coding are used.* On information and belief, Johns Hopkins scores and codes the POvIV2 MMAS-8 responses by applying the MMAS-8 scoring and coding criteria — Plaintiff's trade secrets (¶ 34) — including a construction of the scoring of MMAS-8 item 8 and a cut-point.

141. *METRC's REDCap.* METRC's Coordinating Center, at the Johns Hopkins Bloomberg School of Public Health, states that it "[o]versees data collection, quality monitoring, and statistical analysis … using METRC's secure REDCap platform," and that its Associate Directors "co-lead protocol development, implementation, and data analysis for METRC."

142. *The MMAS-8 on screen, scored by code.* On information and belief, the POvIV2 MMAS-8 is rendered on screen, administered and scored in METRC's REDCap platform: the eight items are reproduced and displayed to each participant, at each visit, at each site, and the flat 0–8 sum and the "6 or more = adherent" flag are fixed as a calculated field and logic in the POvIV2 REDCap project, which was built and is controlled by the METRC Coordinating Center at Johns Hopkins and is made available to every POvIV2 site. Rendering the MMAS-8 on a screen and scoring and coding it automatically is what the Morisky Widget is (¶ 31).

143. *Outside the Morisky Widget.* On information and belief, the MMAS-8 is administered, scored and coded in POvIV2 outside the Morisky Widget; no Morisky Widget condition- and medication-specific test is used; Johns Hopkins holds no Morisky Widget license; and no copyright management information identifying Plaintiff, the Morisky Widget or the terms for use of the MMAS-8 appears on the MMAS-8 as rendered in the REDCap project.

**Period 3 — The Retraction (August 18, 2023 – June 24, 2025)**

144. *The retraction.* On August 18, 2023, the *Journal of Clinical Hypertension* retracted the only published validation of the MMAS-8, Morisky DE, Ang A, Krousel-Wood M, Ward HJ, J Clin Hypertens 2008;10(5):348–354, because "the results were misleading due to issues regarding the sensitivity and specificity" of the MMAS-8, and stated that it "no longer has confidence in the reported conclusions" (Exhibit 3; ¶ 47). It was not without warning: Dr. Ortiz had shown from the paper's own data a sensitivity of about 38%, not 93% (¶ 47), and that the published sensitivity and specificity "clearly overstates, by an order of magnitude, the diagnostic properties of the MMAS-8" (Exhibit 4). The journal received his letter on April 2, 2021, more than two years before POvIV2 enrolled its first patient.

145. *POvIV2 after the retraction.* POvIV2 had begun eighty days before the retraction. After it, Johns Hopkins did not stop the MMAS-8, did not change the rule that a score of "6 or more" is adherent, on information and belief did not tell the patients, and did not disclose the retraction in the trial's registry record. For the 250 patients of POvIV2, the retraction means that of every 100 patients in the oral arm who stop their antibiotic, the MMAS-8 misses about 62 — and the POvIV2 rule misses more, because every patient scoring 6 is counted as adherent. Each patient missed is recorded not as a patient who stopped, but as a patient in whom oral antibiotics failed.

146. *HOW CAN JOHNS HOPKINS, WITH DEPARTMENT OF DEFENSE FUNDING, GREEN-LIGHT THE USE OF A DIAGNOSTIC ASSESSMENT OF MEDICATION ADHERENCE IN SERIOUSLY ILL PATIENTS THAT HAS BEEN RETRACTED FROM THE MEDICAL LITERATURE BECAUSE IT IS ONLY 38% SENSITIVE?*

147. *Johns Hopkins publishes the retracted cut-points as the standard.* On February 11, 2025, eighteen months after the retraction, three authors of the Department of Health, Behavior and Society of the Johns Hopkins Bloomberg

School of Public Health — the school that houses the METRC Coordinating Center — published Burleson J, Stephens DE, Rimal RN, "Adherence Definitions, Measurement Modalities, and Psychometric Properties in HIV, Diabetes, and Nutritional Supplementation Studies: A Scoping Review," Patient Prefer Adherence 2025;19:319–344, funded by a grant to Johns Hopkins University (Exhibit 48). It found that "[t]he 8-item Morisky Medication Adherence Scale (MMAS-8) was the most frequently used self-reported measure" (Exhibit 48 at 335), and stated the MMAS-8 bands as follows: "high adherence was defined as a score of eight, medium as a score of six or seven, and low as a score less than six" (Exhibit 48 at 336). Those are the cut-points of the retracted 2008 article, which classified low adherence as "<6" (¶ 47), written in whole numbers. A score of 6 is low adherence, not medium (¶ 34), and a band written as "six or seven" can be produced only by scoring MMAS-8 item 8 as 0 or 1 instead of in quarter points, which is not the MMAS-8 scoring and coding criteria. The article does not cite the 2008 article or mention its retraction — although its own screening excluded one study as "Retracted" (Exhibit 48 at 334).

148. *PALLAS.* On March 27, 2025, a Johns Hopkins author, Wolff, co-published the PALLAS adherence article, which turned the MMAS-4 into a five-item "MMAS-5" across 9,031 tests (¶¶ 99–102, 112). On June 15, 2025, Plaintiff wrote to Wolff and Johns Hopkins about it (¶ 113).

**Period 4 — After the Invalidation (June 25, 2025 – the Present)**

149. *Only one right left standing.* After the Nevada order and dismissal (¶¶ 69–71) and the Ninth Circuit's holding (¶ 30), the only enforceable rights are Plaintiff's: the Morisky Widget, the Morisky Widget MMAS-8 and the Morisky Widget MMAS-4. No license from MMAR conveys anything, and Johns Hopkins holds no license from Plaintiff.

150. *Plaintiff asks, for the sake of beneficence.* Throughout Period 4 Plaintiff asked each defendant involved for one thing: to correct the flat scoring of the MMAS-8 and the derivative scoring and coding of the MMAS-4 — by re-scoring

and re-coding in the Morisky Widget — and to tell the treating clinicians of the patients affected, for the sake of beneficence (¶ 28).

151. *PALLAS: the record removed, not corrected.* On February 18, 2026, eight months after Plaintiff's notice, the PALLAS correction removed the record without correcting it (¶¶ 107, 114); MD Anderson, notified May 31, 2026, has reported nothing since (¶ 111).

152. *POvIV2: acknowledged, and continued.* On June 7, 2026, Plaintiff sent a written regulatory complaint concerning POvIV2 and PALLAS to the Johns Hopkins Office of Research Integrity and to Johns Hopkins investigators, quoting the registered MMAS-8 endpoint and demanding cessation of its administration outside the Morisky Widget, re-scoring and re-coding in the Morisky Widget, and quarantine of the registry data. On July 9, 2026, Plaintiff sent the Johns Hopkins University Office of Research Integrity a research integrity complaint identifying POvIV2, its MMAS-8 endpoint, the retraction and the REDCap build, and requesting referral to the Department of Defense. On July 20, 2026, that office replied in writing: "Your email has been received." On September 9, 2026, the responsible party submitted an update to the trial's registry record, posted September 11, 2026, leaving the trial recruiting and the MMAS-8 endpoint unchanged. On September 25, 2026, Plaintiff sent a second request. On October 19, 2026, Plaintiff reported the matter to the Department of Defense; on November 6, 2026, the Defense Health Agency informed Plaintiff that the matter belongs to the Johns Hopkins Bloomberg School of Public Health. Apart from the acknowledgment of July 20, 2026, Johns Hopkins has sent nothing.

## FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT

## (Against Defendant Bristol-Myers Squibb Company)

153. Plaintiff incorporates the preceding paragraphs.

154. The BMS License is a valid and enforceable contract, and Plaintiff performed all of its obligations (¶ 75).

155. BMS breached Section 1 by scoring and coding SIMPLICITY MMAS-8 tests outside the Morisky Widget and by permitting their administration by personnel not trained and certified by Plaintiff (¶ 76).

156. Plaintiff has been damaged in an amount to be proven at trial and is entitled to specific performance and to its attorney's fees and costs under Section 2(h).

**SECOND CLAIM FOR RELIEF**

**COPYRIGHT INFRINGEMENT, 17 U.S.C. §§ 106, 501**

**(Against Defendants Genentech, GE HealthCare, BMS, ResMed and Does 1–10)**

157. Plaintiff incorporates the preceding paragraphs.

158. Plaintiff owns a valid copyright in the Morisky Widget, Registration No. TX 8-816-517, a software work in whose deposit the MMAS-8, its translations and its scoring and coding construction are embodied (¶¶ 30, 31). The registration was made on December 3, 2019, within five years after first publication on March 18, 2017, and the certificate is prima facie evidence of the validity of the copyright and of the facts stated in it, including Plaintiff's ownership, 17 U.S.C. § 410(c). As the legal owner of the exclusive rights, Plaintiff is entitled to sue for infringement, 17 U.S.C. § 501(b).

159. Each Defendant copied protected expression without license: Genentech, with Roche and icometrix, and GE HealthCare as icometrix's owner and successor, by reproducing the Morisky Widget MMAS-8 scoring and coding construction in icompanion ms and distributing it (¶¶ 52–55); and BMS, on information and belief, by reproducing the Morisky Widget MMAS-8 in SIMPLICITY outside the Morisky Widget to which its license confined it (¶ 76); and ResMed, through its subsidiary, by reproducing the Morisky Widget MMAS-8

and its scoring and coding construction in an online questionnaire, and by reproducing and distributing that construction in the United States in the article (¶¶ 122–124). ResMed is liable directly; vicariously, having the right and ability to supervise the infringement and a direct financial interest in it; and contributorily, having induced, caused or materially contributed to it with knowledge (¶ 125).

160. The infringement was willful. Genentech's knowledge and willfulness, and the Roche Group's since November 8, 2017, are alleged in ¶¶ 36–46, 61–62, 67 and 72; GE HealthCare's in ¶¶ 63 and 66; ResMed's in ¶ 125. Plaintiff is entitled to actual damages and profits, or statutory damages under 17 U.S.C. § 504(c) of up to $150,000 per work for willful infringement, injunctive relief under § 502, impoundment under § 503, and costs and fees under § 505.

**THIRD CLAIM FOR RELIEF**

**FALSE, REMOVED AND ALTERED COPYRIGHT MANAGEMENT INFORMATION, 17 U.S.C. § 1202**

**(Against Defendants Genentech, GE HealthCare, ResMed and Does 1–10)**

161. Plaintiff incorporates the preceding paragraphs.

162. A copyright notice, the name of the copyright owner, and the terms and conditions for use of a work are copyright management information under 17 U.S.C. § 1202(c).

163. Genentech, with Roche and icometrix, and GE HealthCare as icometrix's owner and successor, on information and belief removed the legend and notice that accompany every authorized Morisky Widget MMAS-8 test when they reproduced it in icompanion ms, in violation of § 1202(b) (¶¶ 51–52). Each MMAS-8 test administered through icompanion ms reproduced the MMAS-8 without that legend and notice and delivered the result to a neurologist, and each is a separate violation of § 1202(b)(1) and (3) (¶¶ 56–57; ¶¶ 58–60). ResMed, through its subsidiary, at ResMed's direction and for its benefit, on information and belief removed that legend and notice when it reproduced the MMAS-8 in its online

questionnaire, and distributed the MMAS-8 scoring construction in the article without them, knowing or having reasonable grounds to know that doing so would induce, enable, facilitate or conceal infringement, in violation of § 1202(b) (¶ 124).

164. Plaintiff is entitled to actual damages and profits, or statutory damages under 17 U.S.C. § 1203(c)(3)(B) of $2,500 to $25,000 for each violation, costs, attorneys' fees and injunctive relief. At the minimum of $2,500 and the maximum of $25,000 for each violation, statutory damages for the MMAS-8 tests administered in ILLUMINATE before its suspension (¶ 57) are $1,250,000 to $12,500,000 for 500 tests, $1,785,000 to $17,850,000 for 714 tests, and $2,500,000 to $25,000,000 for 1,000 tests; for the 1,500 tests the registry schedules through March 31, 2028, they are $3,750,000 to $37,500,000.

**FOURTH CLAIM FOR RELIEF**

**MISAPPROPRIATION OF TRADE SECRETS, DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836**

**(Against Defendants Genentech, GE HealthCare, BMS and Does 1–10)**

165. Plaintiff incorporates the preceding paragraphs.

166. The scoring and coding criteria and rendering architecture of the Morisky Widget MMAS-8 and MMAS-4 are trade secrets under 18 U.S.C. § 1839(3), related to products used in interstate and foreign commerce, deriving independent economic value from not being generally known, and protected by reasonable measures (¶ 34). Plaintiff is the person in whom rightful legal title to the trade secrets is reposed, and is their owner under 18 U.S.C. § 1839(4).

167. *Misappropriation, and misuse as misappropriation by use.* "One party can misappropriate another's trade secret by either acquisition, disclosure, or use." Compulife Software Inc. v. Newman, 959 F.3d 1288 (11th Cir. 2020), slip op. at 38 (Exhibit 39). Misappropriation by use is "[d]isclosure or use of a trade secret of another without express or implied consent by a person who … at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret

was … acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or … derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(II), (III). A license is a duty to limit use. Use beyond the terms of the license, or after it ends, is use without consent — misuse — and misuse is misappropriation by use. Misappropriation by use is complete when the trade secret is used; disclosure is a separate act of misappropriation. "The unauthorized use need not extend to every aspect or feature of the trade secret; use of any substantial portion of the secret is sufficient to subject the actor to liability." Id. at 45 (quoting Penalty Kick Mgmt. v. Coca Cola Co., 318 F.3d 1284, 1292–93 (11th Cir. 2003)). A trade secret taken and altered is still used, so a defective implementation is still use. A protectable trade secret may be distilled from publicly available parts, and use-misappropriation of information acquired by improper means requires no duty external to the statute. Id. at 41 (Exhibit 39).

168. *Acquisition and use.* BMS acquired the trade secrets under its license and, on information and belief, used them outside the Morisky Widget (¶ 76). Genentech and GE HealthCare acquired, used or exploited them outside any license and, with Roche and icometrix, disclosed them in the registry (¶ 52), each knowing or having reason to know that they derived from a person who owed Plaintiff a duty of secrecy. Misuse: the 6 called "medium." The Morisky Widget MMAS-8 three-band classification is a trade secret (¶¶ 34–35, 166). The registered ILLUMINATE scoring took that classification and altered it: it collapsed MMAS-8 item 8, called a score of 6 "medium," and cut the low band at "5 and less" (¶¶ 52, 58–60). Each MMAS-8 test scored and classified through icompanion ms on that construction — on information and belief between 500 and 1,000 before the suspension (¶ 57) — is a separate use of a substantial portion of the trade secrets without Plaintiff's consent, by persons who knew or had reason to know that their knowledge of it derived from

a person who owed Plaintiff a duty to maintain its secrecy or limit its use, 18 U.S.C. § 1839(5)(B)(ii)(III). Each such use moves a patient who is low-adherent under the Morisky Widget MMAS-8 into "medium," and delivers that result to her neurologist (¶ 52). That misuse is misappropriation by use, complete when the patient is scored, and independent of the disclosure in the registry (¶¶ 167, 169).

169. *Disclosure in the sunshine.* The trade secrets were not taken in the dark. They were disclosed in the open, on a federal registry, under the sponsor's name. From August 22, 2023 — four days after the retraction — through July 17, 2026, every one of twenty-six versions of the ILLUMINATE record on ClinicalTrials.gov published an MMAS-8 scoring and coding construction: the total, the three bands and their cut-points, and the change score (¶¶ 58–59; Exhibit 38). GE HealthCare admits that icometrix runs the MMAS-8 with "the scoring guidance" that MMAR supplied (¶ 63), and MMAR had nothing to give (¶ 64). Each version is a disclosure, without Plaintiff's consent, of information derived from Plaintiff's trade secrets, by persons who knew or had reason to know that it was derived from a person who owed Plaintiff a duty to maintain its secrecy, 18 U.S.C. § 1839(5)(B); and each administration through icompanion ms is a use. That the registered construction is defective — MMAS-8 item 8 collapsed, a medium band that takes in 6 and a low band cut off at 5 (¶ 60) — does not make it less a use or a disclosure: "use of any substantial portion of the secret is sufficient" (¶ 167). The registry is also the sponsor's own record of use: it states the scoring that icompanion ms applies to each participant, and the result is delivered to the neurologist (¶ 52).

170. The misappropriation was willful and malicious. Genentech's knowledge and willfulness, and the Roche Group's since November 8, 2017, are alleged in ¶¶ 36–46, 61–62, 67 and 72; GE HealthCare's in ¶¶ 63 and 66. Plaintiff is entitled to damages for actual loss and unjust enrichment, or a reasonable royalty, exemplary damages of up to two times that amount, attorneys' fees and injunctive relief under 18 U.S.C. § 1836(b)(3).

**FIFTH CLAIM FOR RELIEF**

**DECLARATORY RELIEF, 28 U.S.C. §§ 2201–2202**

**(Against All Defendants)**

171. Plaintiff incorporates the preceding paragraphs.

172. An actual controversy exists between Plaintiff and each Defendant.

173. Plaintiff seeks a declaration that (a) Plaintiff owns the Morisky Widget, Registration No. TX 8-816-517; (b) the BMS License remains in full force and binds BMS, and the McGovern License remains in full force and binds UTHealth; (c) no Defendant holds any license from Plaintiff for the conduct alleged other than as stated in (b); and (d) no permission issued by MMAR, including the license on which GE HealthCare and icometrix rely, conveys any right in the Morisky Widget, the Morisky Widget MMAS-8 or the Morisky Widget MMAS-4.

**SIXTH CLAIM FOR RELIEF**

**BREACH OF CONTRACT**

**(Against Defendant The University of Texas Health Science Center at Houston)**

174. Plaintiff incorporates the preceding paragraphs.

175. The McGovern License is a valid and enforceable contract, perpetual in term, and Plaintiff performed all of its obligations under it (¶¶ 77–79).

176. UTHealth, through its faculty and staff, breached the McGovern License (a) by administering, scoring and coding the MMAS-8 outside the Morisky Widget in HSC-MS-16-0593, HSC-MS-18-0425 and HSC-MS-18-0575 and in Salud y Vida (¶¶ 85, 91, 92, 96, 97); (b) by scoring the MMAS-8 with cut-points that are not the Morisky Widget MMAS-8 scoring and coding criteria (¶¶ 86, 95, 96); (c) by publishing MMAS-8 results without first submitting the manuscripts to Plaintiff (¶¶ 87, 95); (d) by omitting from the Salud y Vida article the citations and legend required by Appendix I (¶ 95); (e) by failing to enter the gestational diabetes MMAS-8 results into the Morisky Widget and to carry out the corrective measures

of the Addendum it signed (¶¶ 88–89); and (f) by publishing the Cheng abstract without the citations and legend required by Appendix I and without first submitting it to Plaintiff (¶ 84).

177. Each use of the MMAS-8 outside the McGovern License is a separate breach of a continuing obligation, and each publication is a separate breach. Aryeh v. Canon Business Solutions, Inc., 55 Cal. 4th 1185 (2013). UTHealth's breaches continue: on information and belief, the MMAS-8 results of its gestational diabetes studies and of Salud y Vida have never been re-scored and re-coded in the Morisky Widget, and the publications reporting them have never been corrected.

178. UTHealth is equitably estopped from asserting any limitation of time as to its 2019 breaches. Through Dr. Refuerzo, UTHealth admitted the breach in writing, undertook to enter the results into the Morisky Widget, wrote that it would "proceed," and signed and paid for the Addendum; Plaintiff forbore from suit in reliance on those statements (¶¶ 88–90). Lantzy v. Centex Homes, 31 Cal. 4th 363 (2003).

179. Plaintiff has been damaged in an amount to be proven at trial and is entitled to specific performance of the McGovern License, including the re-scoring and re-coding of every UTHealth MMAS-8 test in the Morisky Widget and the correction of each publication reporting MMAS-8 results.

**SEVENTH CLAIM FOR RELIEF**

**MISAPPROPRIATION OF TRADE SECRETS, DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836**

**(Against Defendant UTHealth)**

180. Plaintiff incorporates the preceding paragraphs.

181. *The trade secrets.* The trade secrets are those alleged in ¶ 166: the scoring and coding criteria of the Morisky Widget MMAS-8, including the conversion of MMAS-8 item 8 into quarter-point values and the three-band classification (¶¶ 34–35).

182. *Acquisition under a duty.* UTHealth acquired the trade secrets under two Morisky Widget licenses, the McGovern License and the Obstetrics License, through training and certification by Plaintiff in Houston, under its covenants that the Morisky Widget may be used only by UTHealth students, faculty and staff trained and certified by Plaintiff and that "[a]ll licensees must submit to MMAS Research all manuscripts that are being considered for publication" (¶¶ 77–81). Dr. Refuerzo was trained and certified on February 22, 2018 (¶ 80). From January 2017, Dr. Morisky's own rule required that all data collection with the MMAS use the Morisky Widget, without exception (¶¶ 32–33).

183. *Use.* UTHealth, through its faculty and staff, used the trade secrets outside the Morisky Widget. In the gestational diabetes protocols, 227 MMAS-8 tests were given to pregnant women with diabetes, on paper or through REDCap, and scored, on Dr. Refuerzo's own account, as "low adherence < 6" and "High adherence 7-8" (¶¶ 85–86; Exhibit 25); in each of those women, BOTH MOTHER AND BABY are at great risk. In Salud y Vida, the MMAS-8 results of 1,616 participants were scored and coded outside the Morisky Widget (¶ 96; Exhibit 24). No MMAS-8 test of Salud y Vida or of the Cheng abstract was administered, scored or coded in the Morisky Widget (¶ 97; Exhibit 34).

184. *The method used: De las Cuevas.* For the MMAS-8 the Salud y Vida article cites one source, De las Cuevas C, Peñate W, Int J Clin Health Psychol 2015;15(2):121–129 (¶ 95; Exhibits 24, 35). That article publishes an MMAS-8 scoring and coding construction: "Response choices are 'yes' or 'no' for items 1 through 7 and Item 8 has a five-point Likert response scale," followed by the item, item 8 and band rules quoted in ¶ 96 (Exhibit 35). It is a construction derived from the Morisky Widget MMAS-8 scoring and coding — item 8 standardized into quarter values and the totals divided into three bands — with the bands misplaced: it calls a total of 6 medium when under the Morisky Widget MMAS-8 it is low, and its medium band of "7 or 6" leaves out the totals of 7.75, 7.50, 7.25, 6.75, 6.50 and

6.25 that its own item 8 rule produces (¶ 96). On information and belief, the Salud y Vida participants' MMAS-8 results were scored and coded by that construction (¶ 96).

185. *Disclosure in the sunshine.* UTHealth did not keep what it acquired. It disclosed it in the open, in the medical literature, under UTHealth's name, each time without Plaintiff's consent and, on information and belief, without first submitting the manuscript to Plaintiff (¶¶ 84, 87, 95): (a) SMFM Abstract No. 396, for the Society for Maternal-Fetal Medicine meeting of February 11–15, 2019, reporting the MMAS-8 results of the gestational diabetes protocols (¶ 87; Exhibit 25); (b) the Cheng abstract, Res Soc Adm Pharm 2018;14(6):e20, reporting MMAS results for 30 self-neglecting older adults (¶ 84; Exhibit 33); and (c) the Salud y Vida article, published in July 2024, which reports the MMAS-8 results of 1,616 participants in three bands and, by its citation of De las Cuevas, publishes the method by which they were scored and coded (¶¶ 95–96; Exhibits 24, 35). Each publication is a disclosure of information derived from Plaintiff's trade secrets by persons who knew or had reason to know that their knowledge of it was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, 18 U.S.C. § 1839(5)(B)(ii)(II). The publications are also UTHealth's own record of use.

186. *A defective implementation is still misappropriation.* Use of any substantial portion of the secret is sufficient (¶ 167; Exhibit 39). That UTHealth's constructions are defective — bands of "< 6" and "7-8" that erase the Morisky Widget MMAS-8 medium band and record a 7 as high (¶ 86), and the De las Cuevas bands that record a 6 as medium (¶ 96) — does not make them less a use or a disclosure (¶¶ 167, 169). The defect is the harm: each patient so classified who is not taking her medicine is recorded as taking it.

187. *Knowledge, and the misappropriation continues.* UTHealth knew the terms of the McGovern License from April 2017; admitted its mistakes in January 2019; signed and paid for the 2019 Addendum requiring it to re-score and re-code

the 227 MMAS-8 tests in the Morisky Widget and issue a corrigendum; and in April 2021 agreed to pay for further training and certification (¶¶ 79, 88–89, 98). The Salud y Vida article was published in July 2024, eleven months after the retraction (¶¶ 47, 98). The disclosures remain in the literature, uncorrected; on information and belief, no MMAS-8 result has been re-scored or re-coded in the Morisky Widget and no corrigendum has been issued (¶¶ 89, 97). UTHealth continues to hold, analyze and report those results. The misappropriation is continuing.

188. *Relief.* Plaintiff is entitled against UTHealth to damages for actual loss and unjust enrichment, or a reasonable royalty, exemplary damages of up to two times that amount, attorneys' fees, and injunctive relief under 18 U.S.C. § 1836(b)(3), including an order restraining any further administration, scoring, coding, publication or distribution of the MMAS-8 outside the Morisky Widget; requiring production of the item-level MMAS-8 responses of each study, de-identified under the study's own participant codes, for re-scoring and re-coding in the Morisky Widget; requiring notification of each participant's treating clinician; and requiring correction of SMFM Abstract No. 396, the Cheng abstract, the Salud y Vida article and each registry record.

**EIGHTH CLAIM FOR RELIEF**

**MISAPPROPRIATION OF TRADE SECRETS, DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836**

**(Against Defendant Eileen Shinn, in Her Individual Capacity)**

189. Plaintiff incorporates the preceding paragraphs.

190. *The trade secrets.* The trade secrets are those alleged in ¶ 166, including the scoring and coding criteria of the Morisky Widget MMAS-4.

191. *Misappropriation by use: the MMAS-5.* Shinn used the trade secrets without Plaintiff's consent. The article's own words show the use: the four MMAS-4 items, their yes/no coding and their division of intentional from unintentional non-adherence — a substantial portion of the trade secrets — taken and altered by adding

a fifth compliance item, summing five items from 0 to 5, and recoding the result into "5" and "< 5" (¶¶ 100–101; Exhibit 40 at 387). The article's own words show her knowledge: she confined the MMAS-4 to its validated translations and recommended validated measures (¶ 109), and so knew or had reason to know that her knowledge of the MMAS-4 scoring and coding was acquired under circumstances giving rise to a duty to limit its use, 18 U.S.C. § 1839(5)(B)(ii)(II). Each of the 9,031 invalid MMAS-5 tests for palbociclib in Table 3 alone (¶ 102) is a separate misuse of the trade secrets without consent. That misuse is misappropriation by use, complete when each patient was scored, and before the article was published.

192. *Disclosure in the sunshine.* On March 27, 2025, Shinn disclosed in the open, in the medical literature, under her own name as lead and corresponding author, the following, in the article's own words: that the MMAS-4 "assessed intentional and unintentional medication-taking behaviors using a dichotomous yes/no response format and included an additional dichotomized item"; that "Morisky Composite scores range from 0 to 5 with a score of 0 indicating 'least adherent' and a score of 5 indicating 'most adherent'"; and the summed composite, the "score = 5 vs. score < 5" comparison, the Table 3 definition and the validated translations quoted in ¶¶ 100–101 (Exhibit 40 at 386, 387, 391). That is a scoring and coding construction derived from the trade secrets, disclosed without Plaintiff's consent (¶¶ 99–100, 103; Exhibit 40). She knew or had reason to know that her knowledge of it was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, 18 U.S.C. § 1839(5)(B)(ii)(II). The article states that its content "is solely the responsibility of the authors" (¶ 106). It is also her own record of use. The February 18, 2026 correction did not withdraw that disclosure; it removed the record of it, without reason and without correction, while declaring the article's conclusions unchanged (¶ 107; Exhibit 41).

193. *Misuse is misappropriation.* The recoding to "< 5" merges medium with low adherence and intentional with unintentional non-adherence (¶ 101; Exhibit 40 at 387). That is misuse of the trade secrets, and misuse is misappropriation by use (¶ 167). That the MMAS-5 is not the MMAS-4 scoring and coding does not make it less a use or a disclosure (Exhibit 39). Each misuse fell on a woman with early breast cancer: in violation of BENEFICENCE, each placed the woman tested at increased risk of death and harm, in an arm whose death rate was about 35% higher and whose serious adverse-event rate was about 65% higher, and the correction that dropped the results left that risk in place (¶¶ 105, 107).

194. *Relief.* On information and belief, the misappropriation was willful and malicious. Plaintiff is entitled against Shinn, in her individual capacity, to damages for actual loss and unjust enrichment, or a reasonable royalty, exemplary damages of up to two times that amount, attorneys' fees, and injunctive relief under 18 U.S.C. § 1836(b)(3).

**NINTH CLAIM FOR RELIEF**

**MISAPPROPRIATION OF TRADE SECRETS BY MISUSE, DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836**

**(Against Defendants Genentech and GE HealthCare)**

195. Plaintiff incorporates the preceding paragraphs.

196. *The trade secrets.* The trade secrets are those alleged in ¶ 166: the MMAS-8 scoring and coding criteria, including the conversion of MMAS-8 item 8 into quarter-point values and the three-band classification (¶¶ 34–35).

197. *Misuse.* The registered ILLUMINATE scoring took a substantial portion of the trade secrets — the eight MMAS-8 items, the three-band classification and its high band at 8 — and altered it without Plaintiff's consent in three ways: it called a total of 6 "medium"; it cut the low band off at "5 and less"; and it collapsed MMAS-8 item 8 into a whole-number sum (¶¶ 52, 58–60). The 2008 article, retracted on August 18, 2023, four days before the scoring was registered, does not

supply it: the article puts the low band at "<6" and scores the last item on "a 5-point Likert response" (¶ 59; Exhibit 42 at 349, 351). The registered scoring is a third construction that matches neither.

198. *Each test a separate misuse.* Each MMAS-8 test scored through icompanion ms on that construction (¶¶ 57, 168) is a separate misuse of the trade secrets, by persons who knew or had reason to know that their knowledge of the trade secrets derived from or through a person who owed Plaintiff a duty to maintain their secrecy or limit their use, 18 U.S.C. § 1839(5)(B)(ii)(III). See ¶¶ 63–64, 169. Each misuse takes a patient whose adherence is low out of the low band, places her in the medium band, and delivers that result to her neurologist (¶ 52).

199. *Misuse is misappropriation.* Use beyond any consent is misuse, and misuse is misappropriation by use, complete when each patient is scored (¶ 167; Exhibit 39). That the registered construction is defective does not make it less a use.

200. *Relief.* The misappropriation was willful and malicious: Genentech's knowledge, and the Roche Group's since November 8, 2017, are alleged in ¶¶ 36–46, 61–62, 67 and 72; GE HealthCare's in ¶¶ 63 and 66. Plaintiff is entitled against Genentech and GE HealthCare to damages for actual loss and unjust enrichment, or a reasonable royalty, exemplary damages of up to two times that amount, attorneys' fees, and injunctive relief under 18 U.S.C. § 1836(b)(3), including an order restraining any further administration, scoring or classification of the MMAS-8 on the registered construction.

## TENTH CLAIM FOR RELIEF

## MISAPPROPRIATION OF TRADE SECRETS — DISCLOSURE IN THE SUNSHINE AND MISUSE, DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

**(Against Defendant ResMed)**

201. Plaintiff incorporates the preceding paragraphs.

202. *The trade secrets.* The trade secrets are those alleged in ¶ 166: the MMAS-8 scoring and coding criteria, including the conversion of MMAS-8 item 8 into quarter-point values; the three-band classification; the derivation of the intentional and unintentional non-adherence scores; and the condition-, medication- and language-specific rendering architecture (¶¶ 34–35).

203. *Misuse.* ResMed, through mementor, used a substantial portion of the trade secrets without Plaintiff's consent, altered in four ways: (a) a derivative German MMAS-8, rendered into its own online questionnaire; (b) classification on the retracted 2008 cut-points, calling a 6 "moderate"; (c) one score for a patient taking up to three medicines, with no intentional or unintentional score; and (d) group means in an ANCOVA in place of any patient's classification (¶¶ 119, 123). Each of up to 180 MMAS-8 tests is a separate misuse, and misuse is misappropriation by use, complete when each patient was scored (¶ 167).

204. *Knowledge of the duty.* mementor knew or had reason to know that its knowledge of the trade secrets derived from or through persons who owed Plaintiff a duty to maintain their secrecy or limit their use, 18 U.S.C. § 1839(5)(B)(ii)(III): the translators of the German MMAS-8 it used, who acknowledged in writing that any MMAS-8 use required the Morisky Widget and a license (¶ 120); and the trial site, which had agreed that the scoring and coding criteria are trade secrets and that its German translation is non-transferable and linked to its license (¶ 121).

205. *Disclosure in the sunshine.* On July 11, 2024, ResMed, through mementor and its employees, disclosed in the open, in a United States medical journal distributed in the United States and through PubMed Central, an MMAS-8 scoring and coding construction derived from the trade secrets — the range from 0 to 8, the three bands and their cut-points — without Plaintiff's consent, in the journal that had retracted the validation on which it rests; and it remains published and uncorrected (¶¶ 122–123, 125; see ¶ 167; Exhibit 39).

206. *Relief.* The misappropriation was willful and malicious (¶ 125). Plaintiff is entitled against ResMed to damages for actual loss and unjust enrichment, or a reasonable royalty, exemplary damages of up to two times that amount, attorneys' fees, and injunctive relief under 18 U.S.C. § 1836(b)(3), including an order restraining any further use of the MMAS-8 outside the Morisky Widget in or in connection with actensio; requiring production of the item-level MMAS-8 responses of the actensio trial for re-scoring and re-coding in the Morisky Widget, each medicine as its own referent; requiring notification of each participant's treating clinician; and requiring correction of the actensio article.

**ELEVENTH CLAIM FOR RELIEF**

**WILLFUL COPYRIGHT INFRINGEMENT — THE DERIVATIVE GERMAN MMAS-8, 17 U.S.C. §§ 106(1), (2), (3), 501**

**(Against Defendant ResMed)**

207. Plaintiff incorporates the preceding paragraphs.

208. *Ownership.* Plaintiff owns the Morisky Widget, Registration No. TX 8-816-517 (¶ 158).

209. *The derivative German MMAS-8.* Without license, ResMed, through mementor, prepared a derivative work — the derivative German MMAS-8 online questionnaire — in violation of 17 U.S.C. § 106(2); reproduced it in up to 180 administrations, § 106(1); and reproduced and distributed its scoring and coding construction in the United States in the actensio article, § 106(3) (¶¶ 119, 124). ResMed is liable directly; vicariously, having the right and ability to supervise the infringement and a direct financial interest in it; and contributorily, having induced, caused or materially contributed to it with knowledge (¶¶ 116, 125).

210. *Willful.* The infringement was willful. mementor proceeded on a translation whose authors had acknowledged in writing that any use required the Morisky Widget and a license (¶ 120), at a trial site whose own license made that translation non-transferable (¶ 121); it published in the journal that had retracted the

validation (¶ 122); and ResMed was given written notice on October 30, 2026 (¶ 125).

211. *Relief.* Plaintiff is entitled to actual damages and profits, or statutory damages under 17 U.S.C. § 504(c) of up to $150,000 per work for willful infringement; injunctive relief under § 502; impoundment under § 503 of the derivative German MMAS-8 questionnaire and its data; and costs and attorneys' fees under § 505.

**TWELFTH CLAIM FOR RELIEF**

**COPYRIGHT INFRINGEMENT, 17 U.S.C. §§ 106, 501**

**(Against Defendant The Johns Hopkins University)**

212. Plaintiff incorporates the preceding paragraphs.

213. Plaintiff owns a valid copyright in the Morisky Widget, Registration No. TX 8-816-517 (¶ 158), registered on December 3, 2019, before POvIV2 began.

214. On information and belief, Johns Hopkins copies protected expression without license by reproducing the MMAS-8 electronically in the POvIV2 REDCap project, displaying it to each participant at each visit, fixing its scoring and coding construction in code, and distributing the project to the trial's sites, outside the Morisky Widget (¶¶ 138–143).

215. The infringement is willful (¶¶ 126–152). Plaintiff is entitled to actual damages and profits, or statutory damages under 17 U.S.C. § 504(c), and to injunctive relief, impoundment, costs and attorneys' fees under 17 U.S.C. §§ 502, 503 and 505.

**THIRTEENTH CLAIM FOR RELIEF**

**CONTRIBUTORY AND VICARIOUS COPYRIGHT INFRINGEMENT**

**(Against Defendant The Johns Hopkins University)**

216. Plaintiff incorporates the preceding paragraphs.

217. Each POvIV2 enrolling site directly infringes Plaintiff's copyright by reproducing and displaying the MMAS-8 to its participants through the POvIV2 REDCap project, outside the Morisky Widget (¶¶ 142–143).

218. *Contributory infringement.* On information and belief, Johns Hopkins, through the METRC Coordinating Center, materially contributes to the infringement at every POvIV2 site by building, hosting and distributing the POvIV2 REDCap project, knowing of the infringement since no later than June 7, 2026 (¶¶ 142, 152).

219. *Vicarious infringement.* On information and belief, Johns Hopkins has the right and ability to supervise the infringing conduct at every site through the Coordinating Center's control of the REDCap project, and a direct financial interest in it as prime recipient of the Department of Defense awards that fund METRC (¶¶ 25, 141).

220. Plaintiff is entitled to actual damages and profits, or statutory damages under 17 U.S.C. § 504(c), and to injunctive relief, costs and attorneys' fees under 17 U.S.C. §§ 502 and 505.

**FOURTEENTH CLAIM FOR RELIEF**

**REMOVAL OF COPYRIGHT MANAGEMENT INFORMATION, 17 U.S.C. § 1202(b)**

**(Against Defendant The Johns Hopkins University)**

221. Plaintiff incorporates the preceding paragraphs.

222. Copyright management information is as alleged in ¶ 162, 17 U.S.C. § 1202(c).

223. On information and belief, Johns Hopkins intentionally removed or altered the copyright management information identifying Plaintiff, the Morisky Widget and the terms for use of the MMAS-8 when it rendered the MMAS-8 in the POvIV2 REDCap project, and distributes and displays copies of it to the trial's participants and sites, knowing that the copyright management information has been

removed, and knowing or having reasonable grounds to know that doing so will induce, enable, facilitate or conceal infringement (¶¶ 142, 143, 152).

224. Plaintiff is entitled to actual damages and profits, or statutory damages under 17 U.S.C. § 1203(c)(3)(B) of $2,500 to $25,000 for each violation, and to costs and attorneys' fees under 17 U.S.C. § 1203(b).

**FIFTEENTH CLAIM FOR RELIEF**

**MISAPPROPRIATION OF TRADE SECRETS, DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836**

**(Against Defendant The Johns Hopkins University)**

225. Plaintiff incorporates the preceding paragraphs.

226. *The trade secrets.* The trade secrets are those alleged in ¶ 166: the MMAS-8 scoring and coding criteria, including the conversion of MMAS-8 item 8 into quarter points and the three-band classification.

227. *Misappropriation by use.* Use of any substantial portion of the secret is sufficient (¶ 167). On information and belief, Johns Hopkins acquired the trade secrets by improper means, without a license, and uses them by fixing a construction of the MMAS-8 scoring and coding criteria, including the scoring of MMAS-8 item 8 and a cut-point, in the POvIV2 REDCap project and applying it to every participant (¶¶ 140, 142), without Plaintiff's consent, knowing or having reason to know that the trade secrets were acquired by improper means.

228. *Misuse is misappropriation.* The POvIV2 cut-point records a total of 6, which is low adherence, as adherent (¶ 139). A defective implementation is still use; the defect is what endangers the patients, not a defense. Each MMAS-8 test scored on that construction is a separate misuse.

229. *Relief.* The misappropriation is willful and malicious, and continued after written notice (¶¶ 126–152). Plaintiff is entitled against Johns Hopkins to damages for actual loss and unjust enrichment, or a reasonable royalty, exemplary

damages of up to two times that amount, attorneys' fees and injunctive relief under 18 U.S.C. § 1836(b)(3).

**SIXTEENTH CLAIM FOR RELIEF**

**MISAPPROPRIATION OF TRADE SECRETS, DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 — PALLAS**

**(Against Defendants Antonio Wolff, in His Individual Capacity, and The Johns Hopkins University)**

230. Plaintiff incorporates the preceding paragraphs.

231. *The trade secrets.* The trade secrets are those alleged in ¶ 166, including the scoring and coding criteria of the Morisky Widget MMAS-4.

232. *Misappropriation by use: the MMAS-5.* Wolff, as an author of the PALLAS adherence article, used the trade secrets without Plaintiff's consent. The article's own words show the use: a substantial portion of the trade secrets, the MMAS-4, taken and altered into the MMAS-5 as alleged in ¶ 191 (¶¶ 100–101; Exhibit 40 at 387). The article's own words show the authors' knowledge (¶¶ 109, 115), and so Wolff knew or had reason to know that his knowledge of the MMAS-4 scoring and coding was acquired under circumstances giving rise to a duty to limit its use, 18 U.S.C. § 1839(5)(B)(ii)(II). Each of the 9,031 invalid MMAS-5 tests for palbociclib in Table 3 alone (¶ 102) is a separate misuse of the trade secrets without consent.

233. *Disclosure in the sunshine.* On March 27, 2025, Wolff, as an author, disclosed in the open, in the medical literature, under his name and his Johns Hopkins affiliation, the MMAS-5 construction quoted in ¶ 192 (Exhibit 40 at 386, 387, 391). That is a scoring and coding construction derived from the trade secrets, disclosed without Plaintiff's consent (¶¶ 99–100, 103, 112; Exhibit 40). The February 18, 2026 correction, issued in his name after written notice, did not withdraw that disclosure; it removed the record of it, without reason and without

correction, while declaring the article's conclusions unchanged (¶¶ 107, 114; Exhibit 41).

234. *Misuse is misappropriation.* The recoding to "< 5" merges medium with low adherence and intentional with unintentional non-adherence (¶ 101). That is misuse of the trade secrets, and misuse is misappropriation by use (¶ 167; Exhibit 39). Each misuse fell on a woman with early breast cancer: in violation of BENEFICENCE, each placed the woman tested at increased risk of death and harm, in an arm whose death rate was about 35% higher and whose serious adverse-event rate was about 65% higher, and the correction that dropped the results left that risk in place (¶¶ 105, 107).

235. *Johns Hopkins.* Wolff acted as a member of the Johns Hopkins faculty, within the scope of his employment, and Johns Hopkins is liable for his misappropriation. Johns Hopkins also had written notice of the PALLAS misuse on June 15, 2025, took no license, and made no correction (¶ 113).

236. *Relief.* On information and belief, the misappropriation was willful and malicious (¶¶ 113–115). Plaintiff is entitled against Wolff, in his individual capacity, and against Johns Hopkins, jointly and severally, to damages for actual loss and unjust enrichment, or a reasonable royalty, exemplary damages of up to two times that amount, attorneys' fees, and injunctive relief under 18 U.S.C. § 1836(b)(3).

**SEVENTEENTH CLAIM FOR RELIEF**

**MISAPPROPRIATION OF TRADE SECRETS, DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 — PALLAS**

**(Against Defendant The University of Texas MD Anderson Cancer Center)**

237. Plaintiff incorporates the preceding paragraphs.

238. *The trade secrets.* The trade secrets are those alleged in ¶ 166, including the scoring and coding criteria of the Morisky Widget MMAS-4.

239. *Misappropriation by use and disclosure.* Shinn, MD Anderson's faculty member, misappropriated the trade secrets by use and by disclosure as

alleged in the Eighth Claim for Relief (¶¶ 189–193), and on information and belief Dr. Symmans, MD Anderson's faculty member and a co-author, took part in the same use and disclosure (¶ 110). They acted within the scope of their employment, and MD Anderson is liable for the misappropriation. The article was published under MD Anderson's name, and the February 18, 2026 correction, which removed the record of the use without correcting it, was published under the same name (¶¶ 107, 110; Exhibits 40, 41).

240. *Misuse is misappropriation.* The recoding to "< 5" merges medium with low adherence and intentional with unintentional non-adherence (¶ 101). That is misuse of the trade secrets, and misuse is misappropriation by use (¶ 167; Exhibit 39). Each misuse fell on a woman with early breast cancer: in violation of BENEFICENCE, each placed the woman tested at increased risk of death and harm, in an arm whose death rate was about 35% higher and whose serious adverse-event rate was about 65% higher, and the correction that dropped the results left that risk in place (¶¶ 105, 107).

241. *Knowledge.* MD Anderson has had written notice since May 31, 2026, has documented the matter and assigned it a case number, and holds no Morisky Widget license (¶ 111).

242. *Relief.* On information and belief, the misappropriation was willful and malicious. Plaintiff is entitled against MD Anderson to damages for actual loss and unjust enrichment, or a reasonable royalty, exemplary damages of up to two times that amount, attorneys' fees, and injunctive relief under 18 U.S.C. § 1836(b)(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants as follows:

A. For actual damages according to proof, and for each Defendant's profits attributable to the acts complained of;

B. At Plaintiff's election, for statutory damages under 17 U.S.C. § 504(c), including enhanced statutory damages for willful infringement, and under 17 U.S.C. § 1203(c)(3)(B) for each violation;

C. For damages, unjust enrichment or a reasonable royalty, and exemplary damages, under 18 U.S.C. § 1836(b)(3);

D. For specific performance of the scoring, coding and submission obligations of the BMS License and of the McGovern License;

E. For a declaration in the terms sought in the Fifth Claim for Relief;

F. For preliminary and permanent injunctive relief requiring each Defendant to produce the item-level MMAS-8 and MMAS-4 responses of its studies, de-identified under the studies' own participant codes, for re-scoring and re-coding in the Morisky Widget, resolved to each patient's actual regimen with each medicine as its own referent; requiring the classification of every participant into the three MMAS-8 bands and the notification of each participant's treating clinician; and requiring correction of each publication and registry record;

G. For preliminary and permanent injunctive relief restraining each Defendant from any further reproduction, administration, scoring, coding, publication or distribution of the MMAS-8 or MMAS-4 outside the Morisky Widget;

H. For a preliminary injunction (i) restraining GE HealthCare, and those acting in concert with it, including icometrix, from administering, scoring, classifying or reporting the MMAS-8 through icompanion ms; (ii) requiring preservation of the icompanion ms source code, the MMAS-8 scoring logic as coded, every participant's MMAS-8 responses, scores and categories, every report sent to a neurologist, and all communications with MMAR; and (iii) prohibiting transfer of the

MMAS-8 module, its scoring logic or the participant MMAS-8 data to any incoming sponsor or other third party except by order of the Court;

I. For a preliminary injunction (i) restraining Johns Hopkins, and those acting in concert with it, including the METRC Coordinating Center and the POvIV2 sites, from administering, scoring, classifying or reporting the MMAS-8 in POvIV2 outside the Morisky Widget, and from classifying any participant with an MMAS-8 score of 6 as adherent; (ii) requiring preservation of the complete POvIV2 REDCap project, including every item-level MMAS-8 response, the data dictionary, every calculated field and logic used to score or classify the MMAS-8, the project's version history and its audit trail; and (iii) prohibiting deletion, alteration or transfer of that project or the participant MMAS-8 data except by order of the Court;

J. For impoundment under 17 U.S.C. §§ 503 and 1203(b)(2);

K. For costs of suit;

L. For attorneys' fees under 17 U.S.C. §§ 505 and 1203(b)(5), 18 U.S.C. § 1836(b)(3)(D) and Section 2(h) of the BMS License;

M. For prejudgment and post-judgment interest at the maximum rate allowed by law; and

N. For such other and further relief as the Court deems just and proper.

Dated: November 13, 2026

**HANKIN PATENT LAW, APC**
By: /Marc E. Hankin/

Marc E. Hankin, Esq.
Attorneys for Plaintiff,
**MMAS RESEARCH LLC**

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all issues so triable in this action.

Dated: November 13, 2026

**HANKIN PATENT LAW, APC**
By: /Marc E. Hankin/

Marc E. Hankin, Esq.
Attorneys for Plaintiff,
**MMAS RESEARCH LLC**